ORDERED that J.H. Minet's partial summary judgment motion be and hereby is denied without prejudice; and it is further,

ORDERED that Marshall and Sterling's and the Government's motions to strike BancFlorida's affidavits be and hereby are denied as moot; and it is further,

ORDERED that the Government's motion to strike BancFlorida's post-hearing memorandum and affidavits is granted.

**Beth E. WARD, et al.**

v.

**The JOHNS HOPKINS UNIVERSITY.**

**Civ. A. No. WN-92-3617.**

United States District Court,
D. Maryland.

April 22, 1994.

Janet A. Vecchia and Judith A. Wolfer, Takoma Park, MD, for plaintiffs.

Estelle A. Fishbein, Frederick G. Savage and Eileen S. Goldgeier, of the Johns Hopkins University, Baltimore, MD, for defendant.

### MEMORANDUM

NICKERSON, District Judge.

Currently pending before the Court are Defendant's Motions for Summary Judgment as to Plaintiffs Cusimano and Ward (Papers Nos. 65 and 66) and Defendant's Motion for Severance (Paper No. 54). Plaintiffs have opposed the motions and Defendant has replied. Upon a review of the motions and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6), that Defendant's motions for summary judgment will be granted in part and denied in part, and Defendant's motion for severance will be denied.

## I. BACKGROUND

Plaintiffs in this case, Theresa Cusimano ("Cusimano") and Beth Ward ("Ward") are two former employees of Defendant, The Johns Hopkins University ("the University"). Both Plaintiffs claim that the same individual sexually harassed them while they were employed at the Center for Social Organization of Schools ("CSOS"), a division of the University. They bring their claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"). Ward also alleges sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"). Both Plaintiffs demand compensatory and punitive damages as well as equitable relief. The University moves for summary judgment against both Plaintiffs on all claims. The

University previously moved for severance of Plaintiffs' cases. The facts of this case, presented in the light most favorable to Plaintiffs, are as follows.

Cusimano, a college graduate, was employed at CSOS from October 1990 until June 1991. Cusimano was originally hired at CSOS through a temporary employment agency. In April 1991, she became a permanent employee at CSOS. CSOS occupies a three-story townhouse where Cusimano worked in the front office on the first floor. Cusimano's duties included answering the telephone, typing, filing, copying, distributing messages and packages and other clerical duties. Cusimano's supervisors were Bridgette Hinte ("Hinte") and Barbara Colton ("Colton").

Cusimano claims that Mark Christian ("Christian"), also an employee at CSOS, sexually harassed her. Christian, who is married and has three children, worked in the basement as a dissemination coordinator in the publications section of CSOS.[1] Cusimano encountered Christian on a daily basis. He frequently asked her to go on dates or for a ride in his sports car. Cusimano consistently declined these invitations. Cusimano alleges that every time she encountered him, Christian touched her in some way. This physical contact included touching her lower back while she was at her desk, whispering in her ear and brushing up against her in the hall. While she was at the photocopying machine, Christian unnecessarily positioned himself in such a way that Cusimano could not get by without brushing up against him. Cusimano noticeably flinched when Christian touched her and often told him that she did not like to be touched. In addition to the physical contact, Christian often complimented Cusimano's physical appearance and referred to her and her co-workers as "the pretty girls in the front office."

One evening in February 1991, Christian telephoned Cusimano and asked if he could come over to her apartment. Cusimano tried in a polite manner to discourage him from visiting and told him that she goes to bed at 10:00 p.m. Christian knocked on her door at 11:00 p.m., and Cusimano opened it slightly. Christian entered with a four-pack of wine coolers and revealed to Cusimano that he had a gun under his shirt. He playacted with the gun, rolling on the floor and pretending to shoot someone. The visit lasted ten or fifteen minutes. When he telephoned Cusimano a few days later, she told him to stay away from her and never to talk to her again. After that telephone call, Christian's alleged harassment ceased.

In her affidavit, Cusimano states that she told Colton two or three times that she felt uncomfortable around Christian because she did not like him staring at her and "hitting on her." Cusimano Affidavit at ¶ 3. Cusimano also states that once a week she told Hinte that Christian frequently stared at her, asked her on dates, and was "too friendly." *Id.* Hinte and Colton responded by stating that Christian was just a "friendly guy." *Id.*[2] Several weeks after the February incident in her apartment, Cusimano told Hinte and another co-worker, Barbara Boward, about it in detail. According to Cusimano, because she feared retaliation by Christian and believed any adverse action on her part might preclude favorable recommendations from her supervisors at CSOS for future jobs, Cusimano asked Hinte and Boward to keep the information confidential. Despite that request, Hinte told Colton about the incident and that Cusimano asked that it remain confidential. Colton never discussed Christian's visit to Cusimano's apartment with Cusimano.

Cusimano did not report Christian's harassment to any supervisor other than Hinte. She testified that she did not feel comfortable discussing her harassment with either Colton or the Co–Director of CSOS,

---

1. For reasons not given by the parties, Christian is no longer employed at CSOS.

2. Cusimano did not elaborate on these conversations with Colton and Hinte in her deposition, but only stated that she "alluded to this behavior on numerous occasions to Bridgette Hinte." Cu-

simano Deposition at 121. Defendant argues that her affidavit is fabricated in response to its motion for summary judgment and moves to strike it. Because the testimony in the deposition and the affidavit do not directly conflict, the Court will deny Defendant's motion.

Jim McPartland. She explained in her deposition:

> Those aren't two people who would act on anything of this nature. Here is Jim who comes in and burps and farts in the front office. Is that a person who you're going to share with about abusive behavior? I would think not.

Cusimano Deposition at 165–66. She added: "Barbara Colton was an incompetent manager ... that was very clear...." *Id.*

Ward, a college student who worked at CSOS as a temporary summer employee from June 1 to August 15, 1992, claims that Christian sexually harassed her during the first three weeks of her employment. She was stationed in the basement and her duties included filing, typing, packing orders, handling telephone calls, mailing invoices and other clerical work. Her direct supervisors were Christian and Diane Diggs. Ward's mother, Barbara McHugh, worked on the second floor CSOS.

Ward alleges that Christian's sexual harassment began on her second day of work when she first met him. She describes Christian as "leering" at her when they were introduced, looking her up and down and telling her the other male students "really like[d]" her. Ward Deposition at 74. Later that day, Christian asked Ward to go to lunch with him. She assumed they would walk to a nearby sandwich shop, but Christian took her to his car. She rode with him "because he was my boss, and I didn't know what to do." *Id.* at 77. She testified that he took her for a fifteen minute ride on the expressway and frightened her by driving about eighty-five miles an hour and running a red light. Christian "leaned into" her during the ride.

For the following three weeks, Christian repeatedly asked Ward to go on dates. According to her, he asked every time they were alone and only when they were alone. *Id.* at 83. Ward consistently refused. Although Ward had her own desk, Christian would have her perform work at his desk when Ward's other supervisor, Diane Diggs, was out of the room. Ward testified that Christian kissed her on two occasions. The first time, he kissed the top of her head. With respect to the second kiss, Ward testified that Christian attempted to kiss her on the lips, yet because she lowered her head, the kiss landed on her forehead.

Ward told her mother, Barbara McHugh, on a daily basis about Christian's conduct and that it made her feel uncomfortable. After McHugh learned of the second kiss, she spoke with John Hollifield, the Associate Director of CSOS. Hollifield was receptive to her concerns and stated that even a hint of sexual harassment would not be tolerated. Hollifield then spoke with Christian, who denied the alleged conduct. Although Hollifield had not revealed the identity of the complainant, Christian inquired whether Ward or McHugh had made the complaint. Hollifield Deposition at 30–31. Hollifield also spoke with Diggs about McHugh's concerns and ultimately concluded that no harassment had occurred. Hollifield then told McHugh that her daughter had misinterpreted Christian's conduct as sexual harassment. Although Hollifield had instructed Christian not to discuss the matter with McHugh, Christian subsequently confronted McHugh and threatened to file a defamation suit against her. Hollifield Deposition at 43. Ward claims that Christian retaliated against her by assigning her the more mundane duties in the less attractive portion of the basement.[3]

Hollifield and McPartland later suggested to McHugh that Ward move to a different section of CSOS in a separate building for the rest of the summer. McHugh passed this suggestion on to her daughter. Ward declined to move because she liked the others in the basement at CSOS and because "I didn't feel that I should have to move because [Christian] did something wrong. I didn't do anything." Ward Deposition at 104. Christian continued to work in the basement at CSOS. During the week that

---

**3.** In support of this allegation, Ward has submitted several photographs of the basement area. Defendant moves to strike these photographs on the grounds that they have not been authenticated. Plaintiffs have subsequently provided authentication. The Court therefore denies this motion.

Diane Diggs, Ward's other supervisor, was on vacation, Ward worked on the second floor with her mother.

The University has a policy prohibiting the sexual harassment of its employees which is published in its "Staff Handbook." Cusimano alleges that she did not have knowledge of this policy nor of any mechanism within the University for reporting sexual harassment. Although she requested a copy of the Staff Handbook from the human resources department of the University, she never received one. Like Cusimano, Ward never received a copy of the University's policy on sexual harassment and was not aware of the procedures for reporting sexual harassment. The University does not have a policy of distributing Staff Handbooks to summer student employees. Neither McPartland nor Hollifield ever received training on sexual harassment. *See* McPartland Deposition at 143; Hollifield Deposition at 30.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the evidence before the Court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Rule 56 mandates the entry of summary judgment against a party who, after reasonable time for discovery and upon motion, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial [and] [t]he moving party is 'entitled to judgment as a matter of law.'" *Id.* at 323, 106 S.Ct. at 2553. (citations omitted).

If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). Unsupported speculation is insufficient to defeat a motion for summary judgment. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411–12 (4th Cir. 1986)). Moreover, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10. Thus, only disputes over those facts that might affect the outcome of the case under the governing law are considered to be "material." *Id.* Finally, in assessing such a motion, the Court must view the evidence and all justifiable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962) (per curiam).

With these principles in mind, the Court will address the arguments presented by the parties.

## III. THE UNIVERSITY'S MOTIONS FOR SUMMARY JUDGMENT

This case presents two unique preliminary issues: first, whether the Fourth Circuit's application of Title VII standards in cases of hostile environment sexual harassment is consistent with the recent Supreme Court decision in *Harris v. Forklift Sys.*, —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); and second, whether the standards applicable to a Title VII claim of hostile environment sexual harassment are to be applied to a similar claim brought under Title IX.

### A. Sexual Harassment Under Title VII.

 Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The Supreme Court has recognized that the sexual harassment of an employee may give rise to a claim of sex discrimination under Title VII. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64, 106

S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) ("The phrase 'terms, conditions, or privileges or employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment. . . .") (internal quotations and citations omitted). The Court established that when "discriminatory intimidation, ridicule, and insult," *id.* at 65, 106 S.Ct. at 2405, in the workplace is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," Title VII is violated. *Id.* at 67, 106 S.Ct. at 2405 (internal quotations and citations omitted).

■ There are two theories under which sexual harassment is actionable. One is known as *"quid pro quo,"* in which sexual favors are directly linked to some monetary or employment benefit. *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404. The other is the hostile environment theory, in which the harasser's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a)(3); *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404–05. In this case, Plaintiffs bring their claim under the hostile environment theory.

The Supreme Court recently reaffirmed *Meritor* in *Harris,* ── U.S. at ──, 114 S.Ct. at 370, and clarified the standard of proof to be applied in a sexual harassment claim. The *Harris* Court characterized the standard as a "middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause tangible psychological injury." *Id.* at ──, 114 S.Ct. at 370. The Court further elaborated on this middle path:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment and there is no Title VII violation.

But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their . . . gender . . . offends Title VII's broad rule of "workplace equality."

*Id.* at ──, 114 S.Ct. at 370–71.

*Harris* resolved "a conflict among the Circuits on whether conduct, to be actionable as 'abusive work environment' harassment . . . must seriously affect an employee's psychological well-being or lead the plaintiff to suffer injury." *Id.* at ──, 114 S.Ct. at 370 (internal quotations and brackets omitted). *Harris* answered this question by finding that "concrete psychological harm [is] an element Title VII does not require." *Id.* at ──, 114 S.Ct. at 371. The Court explained further: "Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive . . . there is no need for it also to be psychologically injurious." *Id.* (internal citations omitted).

The Fourth Circuit's and this Court's prior decisions are consistent with *Harris.* *See, e.g., Paroline v. Unisys Corp.,* 879 F.2d 100, 104–05 (4th Cir.1989) (requiring that the alleged harassment interfered with the plaintiff's ability to perform her work *or* significantly affected her psychological well-being) (emphasis added), *vacated in part on other grounds,* 900 F.2d 27 (4th Cir.1990); *Boarman v. Sullivan,* 769 F.Supp. 904, 909 (D.Md.1991) (Nickerson, J.) (applying the standards set forth in *Paroline); Raley v. Board of St. Mary's County Com'rs,* 752 F.Supp. 1272, 1280 (D.Md.1990) (Nickerson,

374

J.) (same). Thus, this Court continues to be guided by *Paroline.*

## B. Hostile Environment Sexual Harassment Under Title IX.

■ Before the Court turns to the application of the standards of *Paroline,* it must address a second preliminary question: whether Title VII standards apply in a case brought under Title IX. Title IX of the Education Amendments of 1972 provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681.[4] Few courts have addressed the appropriate standard of proof to be applied in a case where the plaintiff alleges hostile environment sexual harassment under Title IX. Although neither the Supreme Court[5] nor the Fourth Circuit have directly addressed this issue, decisions in other circuits and districts provide guidance.

Defendant contends that the appropriate standard for establishing a prima facie case of sexual harassment under Title IX is enumerated in *Bougher v. University of Pittsburgh,* 713 F.Supp. 139 (W.D.Pa.), *aff'd on other grounds,* 882 F.2d 74 (3d Cir.1989). In *Bougher,* the district court flatly concluded that "Title IX simply does not permit a 'hostile environment' [sex discrimination] claim." *Id.* at 145. The *Bougher* court applied a standard of proof derived directly from the language of Title IX: "To prove a prima facie case, plaintiff must show 1) that she was excluded from participation in or denied the benefits of or subjected to discrimination in an educational program; 2) that the program receives federal assistance; and 3) that the exclusion was on the basis of sex." *Id.* at

143–44. Defendant's reliance on this case and its stringent standard is misplaced. The facts of *Bougher* are distinct from those presented here. Unlike Cusimano and Ward, who bring their case as employees, the plaintiff in *Bougher* was a student who alleged discrimination based on sex by the university's teachers. Moreover, in affirming the district court's opinion in *Bougher,* the court of appeals based its decision on the issue of the statute of limitations. The court "decline[d] to adopt [the district court's] reasoning *in toto* and [found] it unnecessary to reach the question, important though it may be, whether evidence of a hostile environment is sufficient to sustain a claim of sexual discrimination in education in violation of Title IX." *Bougher v. University of Pittsburgh,* 882 F.2d 74, 77 (3d Cir.1989). *See Patricia H. v. Berkely Unified School District,* 830 F.Supp. 1288, 1291 (N.D.Cal.1993) (finding similar reliance on *Bougher* to be "misplaced").

*Lipsett v. University of Puerto Rico,* 864 F.2d 881 (1st Cir.1988), is more closely on point with the present case. In *Lipsett,* the plaintiff, both a student and an employee of the university, alleged that her supervisor had sexually harassed her in her capacity as an employee. With respect to the plaintiff's Title IX claim, the First Circuit applied the *Meritor* analysis of hostile environment claims to decide the liability of an education institution under Title IX. *Id.* at 899–901; *see id.,* at 899 ("Although the plaintiff in *Meritor* sued under Title VII, we apply the same analysis to sexual harassment claims under Title IX.").

Similarly, in *Mabry v. State Bd. of Community Colleges and Occupational Educ.,* 813 F.2d 311 (10th Cir.), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104

**4.** Defendant does not deny it receives Federal financial assistance.

**5.** *See Franklin v. Gwinnett County Pub. Sch.,* —— U.S. ——, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). The issue in *Franklin* was whether monetary damages are an available remedy in a case of sexual harassment brought under Title IX. The petitioner/plaintiff was a student who alleged that a teacher employed by the defendant had sexually harassed her. The Court determined that it "need not address" the Eleventh Circuit's

rejection of petitioner's argument that the remedies under Titles VII and IX are identical. *Id.* at ——, n. 4, 112 S.Ct. at 1032, n. 4. In addition, because the petitioner in *Franklin* alleged intentional discrimination, the Court did not address the issue of whether the "knew or should have known" standard of Title VII or the higher intentional standard of Title VI of the Civil Rights Amendments should apply. *Id.* at ——, 112 S.Ct. at 1037.

(1987), the Tenth Circuit noted that Title VII standards should be applied to a case of gender discrimination brought under Title IX. The plaintiff in *Mabry* alleged that her employment from an educational institution was terminated because of her gender and her marital/parental status. The court "f[ou]nd no persuasive reason not to apply Title VII's substantive standards regarding sex discrimination to Title IX suits." *Id.* at 316. The court elaborated in a footnote: "Because Title VII prohibits the identical conduct prohibited by Title IX, i.e. sex discrimination, we regard it as the most appropriate analogue when defining Title IX's substantive standards...." *Id.* at n. 6. *See also, Serda v. Joseph Hancock,* 842 F.Supp. 1315 (D.Kan.1993) ("conclud[ing] that the substantive law of Title VII should be used to determine whether the [defendants (owners of a vocational school) ] may be liable for the alleged acts of harassment by its director against [the plaintiff, a vocational student].'"); *Patricia H.,* 830 F.Supp. at 1293 (finding that "the law permits plaintiffs to state a claim for hostile environment sexual harassment under Title IX") (involving claims by a student that a teacher employed by the defendant had sexually harassed her in violation of Title IX).

In addition, the Court notes that the legislative history of Title IX indicates that Title VII standards were contemplated by Congress:

> One of the most important pieces of legislation which prompted the cause of equal employment opportunity is Title VII of the Civil Rights Act of 1964 which ... prohibits any practice by employers which would tend to discriminate against an employee ... on the basis of ... race, religion, sex or national origin. Title VII, however, specifically excludes educational institutions from its terms. [Title IX] would remove that exemption and bring those in education under the equal employment provisions.

H.R.Rep. No. 554, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News 2462, 2512.

In light of the cases discussed, the legislative history and the Supreme Court's directive to give Title IX "a sweep as broad as its language," *North Haven Bd. of Education v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1918, 72 L.Ed.2d 299 (1982), the Court determines that Plaintiffs' Title IX claims are appropriately analyzed under the standards applicable to cases brought under Title VII.

**C. The Prima Facie Elements of a Sexual Harassment Claim.**

■ To prove a hostile work environment claim under Title VII, Plaintiffs must show "(1) that the conduct in question was unwelcome, (2) that the harassment was based on sex, (3) that the harassment was sufficiently pervasive or severe to create an abusive working environment, and (4) that some basis exists for imputing liability to the employer." *Paroline,* 879 F.2d at 104–05. The University does not dispute that there is a genuine dispute of fact as to whether Christian's conduct was unwelcome by Plaintiffs.

■ **1. The Sexual Nature of the Alleged Conduct.** With respect to the second element, the University argues that Christian's conduct toward Cusimano was not "based on sex" because it did not carry sexual overtones.[6] Cusimano has presented sufficient evidence, however, upon which a jury could reasonably conclude that Christian's conduct towards her was sexual. Conduct need not be accompanied by explicit sexual comments in order for a finder of fact to determine that it is sexual in nature. Whether Christian's brushing up against Cusimano, whispering in her ear, and touching her lower back was conduct "based on sex" is a question to be determined by the jury.

■ **2. Pervasiveness and Severity of the Conduct.** Whether the alleged harassment was sufficiently severe or pervasive is "quintessentially a question of fact." *Paroline,* 879 F.2d at 105. Summary judgment is only appropriate if, accepting all Plaintiffs' evidence as true and drawing all inferences in their favor, a jury could not reasonably conclude that Christian's conduct was so severe or pervasive as to create an abusive or

---

6. The University does not dispute that Christian's alleged conduct toward Ward was sexual.

hostile working environment. *Id.* To determine whether the conduct meets this standard, the evidence must be examined from both the subjective and objective perspectives. Plaintiffs "must first demonstrate that the harassment interfered with her ability to perform her work or significantly affected her psychological well-being." *Id.* The next question is "whether the harassment would interfere with the work performance or significantly affect the psychological well-being of a reasonable person in the plaintiff's position." *Id.*

■ In *Harris*, the Court noted that there is no "mathematically precise test" for determining whether a work environment is hostile or abusive. —— U.S. at ——, 114 S.Ct. at 371. The Court listed several factors to consider, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* *Harris* cautions that "no single factor is required." *Id.* With these considerations in mind, the Court determines that Plaintiffs have presented sufficient evidence to defeat the motions for summary judgment.

With respect to Cusimano's claims, there is evidence that the conduct in question was frequent: Cusimano testified that "Every time [Christian] was in the office or in the copy room, he would touch me in some way. He could not speak to me without touching me or without being six inches from my face." Cusimano Deposition at 119. Cusimano states that she constantly had to maneuver her workload to avoid Christian as much as possible.[7] She felt physically threatened by the incident in her apartment

with the gun. Cusimano states that she suffers from migraine headaches, has trouble sleeping because of Christian's conduct and has become less trusting of men. *Id.* at 9. She submits the report of a psychiatrist to corroborate evidence of her injury. With respect to Ward's claims, she states that she was physically affected in that she "was exhausted the end of the day after trying to figure out where [Christian] was at all times as a way of protecting myself from him." Ward Affidavit at ¶ 22. The alleged harassment was frequent—it occurred every time she and Christian were alone. She testified that Christian's conduct has caused her to suffer headaches and nightmares and submits the report of a psychiatrist to support this evidence. A jury could reasonably conclude from this evidence that Christian's conduct interfered with Cusimano's and Ward's ability to work or affected their psychological well-being and that a reasonable person would have been so affected.[8]

■ **3. Imputing Liability to the University.** With respect to imputing liability to the employer, "an employer is liable for one employee's sexual harassment of another worker if the employer had actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt *and adequate* remedial action." *Paroline*, 879 F.2d at 106 (internal quotations and citations omitted). Plaintiffs can demonstrate the University's knowledge by showing that it knew or should have known of the harassment. *Lipsett*, 864 F.2d at 898–901 ("[I]in a Title IX case, an educational institution is liable ... *if* an official representing that institution knew, or ... should have known, of the harassment's occurrence, *unless* that official can show that

---

7. Evidence of Cusimano's avoidance of Christian is corroborated by Judith Paver, a CSOS employee who was trained by Cusimano. *See* Opposition, Exhibit 7, Paver's Affidavit, ¶ 3.

8. The Court's decision to permit these issues to go before the jury is consistent with *Shope v. Bd. of Supervisors of Loudoun County*, 1993 WL 525598, 1993 LEXIS 33058, 63 Empl.Prac.Dec. (CCH) p. 42,755 (4th Cir. Dec. 20, 1993). In *Shope*, the Fourth Circuit applied the *Harris* standard to a case in which the plaintiff alleged a hostile work environment based on gender discrimination under 42 U.S.C. § 1983. The plain-

tiff in *Shope* presented evidence at trial that her supervisor's constant verbal disparagements of her focused on her gender and on occasion were coupled with conduct that threatened physical abuse, such as pounding on the desk and shouting in the plaintiff's face. Affirming the jury verdict in the plaintiff's favor, the court stated, "This evidence is the sort the Supreme Court recently indicated would suffice to make out a hostile working environment claim based on sex discrimination." *Id.* at *2, 1993 LEXIS 33058, at *4.

he or she took appropriate steps to halt it."); *Katz v. Dole,* 709 F.2d 251, 256 (4th Cir.1983) (holding employer liable for hostile environment sexual harassment under Title VII if the "employer knew or should have known of the harassment, and took no effectual action to correct the situation").

Whether the University had actual or constructive notice of harassment of either Plaintiff is a genuinely disputed fact in this case. Cusimano alleges that she told both Colton and Hinte that she felt Christian's behavior was inappropriate. Ward alleges that the University was on constructive notice of Christian's harassment because it knew or should have known that several other women, including Cusimano, had been harassed by him. *See* Plaintiffs' Opposition, Exhibits 7–9 (Affidavits of other female employees at CSOS who claim that Christian sexually harassed them and that they informed their supervisors of his conduct). While the University disputes this evidence, it represents genuine questions of fact to be answered by the jury. Whether the University took "prompt and remedial action" upon this notice is likewise a question of fact to be determined by the jury. *See Paroline* 879 F.2d at 106 ("The adequacy of [Defendant's] remedy is a question of fact which a court may not dispose of at the summary judgment stage if reasonable minds could differ as to whether the remedial action was 'reasonably calculated to end the harassment.' ") (citation omitted).[9]

## D. Ward's Retaliation Claim.

 The prima facie elements of a discriminatory retaliation case brought under Title VII, 42 U.S.C. § 2000e–3 [10] are: "(1) the employee engaged in protected activity, (2) the employer took adverse employment action against the employee, and (3) a causal

connection existed between the protected activity and the adverse action." *Raley v. Bd. of St. Mary's County Com'rs,* 752 F.Supp. at 1281; *see Ross v. Communications Satellite Corp.,* 759 F.2d 355 (4th Cir.1985). The University argues that because Ward has not presented evidence of "adverse employment action," she has not satisfied the second element.

This Court has previously applied the disparate treatment standards for employment discrimination as outlined by *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981), in the context of a Title VII sexual harassment case. *See Raley,* 752 F.Supp. at 1281 ("It is the view of this Court ... that the guidelines of [*Page* ] ... must be applied in retaliation contexts...."). In *Raley,* this Court defined "adverse employment action" to be "ultimate employment decisions," *id.* (quoting *Page,* 645 F.2d at 233), which *Page* defined as including "hiring, granting leave, discharging, promoting, and compensating." *Page,* 645 F.2d at 233. Under the *Page* standard, Ward's retaliation claim fails.

Ward alleges that Christian's retaliation consisted of not speaking to her and giving her less favorable assignments in the "dirtier" part of the basement. This action, while it may have been in retaliation for McHugh reporting Christian's conduct to Hollifield, does not amount to adverse employment action as a matter of law. In addition, Ward's claim that Hollifield's suggestion that she move to another division of CSOS was an act of retaliation is not supported by the record. If that suggestion indicates anything, it indicates an attempt, whether or not sufficient, to remedy the alleged harassment. Thus, to the extent that Ward's Third Amended Complaint states a claim of discriminatory retaliation,[11] that claim is dismissed.

9. The University submits copies of its policy against sexual harassment in support of its case. However, "to avoid liability under Title VII, an employer on notice of sexual harassment must do more than indicate the existence of an official policy against such harassment." *Katz,* 709 F.2d at 256.

10. Section 2000e–3 provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ...

because he has opposed any practice made an unlawful employment practice by [Title VII]...."

11. The Third Amended Complaint contains no separate count for retaliation. In her opposition to the motion for summary judgment, Ward uses the term "retaliatory harassment," Ward Opposition at 45, indicating that the allegations of Christian's retaliation against her are part of her Title VII claim rather than a separate claim.

### E. Injunctive Relief.

█ Plaintiffs request that the Court order the University (1) to reinstate Cusimano to her position at CSOS or a comparable position at the University and (2) to "create and implement a comprehensive policy and procedures [for] addressing sexual harassment." Third Amended Complaint, ¶¶ VI.D and E. The University argues that Plaintiffs' request for injunctive relief should be dismissed because they are no longer employed by the University and can only speculate that they will re-apply for future employment. The Court agrees. Neither Plaintiff has standing to request injunctive relief. Although they may intend to re-apply to the University, they have not done so. Because Cusimano does not claim constructive discharge, she cannot be reinstated to her job at CSOS. *See Davis v. Marsh,* 876 F.2d 1446, 1450–51 (9th Cir.1989) (plaintiff who has been discharged lacks standing for injunctive relief as "she has virtually no chance of suffering future sexual harassment. . . ."). Plaintiffs' requests for injunctive relief will therefore be dismissed.

### F. Punitive Damages.

█ The University argues that Plaintiffs' request for punitive damages should also be dismissed. Section 102(b)(1) of the Civil Rights Act of 1991 provides for punitive damages in cases of "malice or . . . reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). Plaintiffs have presented several pieces of evidence relevant to this issue, including evidence that the University has been aware since 1989 that its policy and procedures pertaining to sexual harassment were inadequate, *see* Plaintiffs' Opposition, Exhibit 30 (Provost Reports on the Status of Women 1989–1991), and despite this awareness, did not update its policies or procedures and did not train the supervisors at CSOS on sexual harassment issues. In addition, there is evidence that the University may have known of Christian's inappropriate conduct before Plaintiffs worked at CSOS but did not act to prevent it. Without concluding that the evidence now before the Court will mandate ultimate submission of the punitive damage claim to a jury, it is sufficient to defeat the motion for summary judgment at this juncture in the proceedings.

## IV. THE UNIVERSITY'S MOTION FOR SEVERANCE

█ April 30, 1993, the Court granted Ward's motion to Amend the Complaint, noting that under Rule 20(b) of the Fed.R.Civ. P., it may later order separate trials to prevent prejudice. Now that discovery is complete, the University requests severance under Rules 20(b) and 42(b). The University argues that Cusimano's and Ward's claims involve separate and distinct sets of facts and joinder of them will result in prejudice to the University.

In support of its motion, the University cites *Weir v. Litton Bionetics,* 41 Fair Emp. Prac.Cas. 1150, 1986 WL 11608 (D.Md.1986) (Harvey, J.), in which the court granted the defendant's motion for severance. *Weir* is distinct from this case, however. While the two plaintiffs in *Weir* raised common questions of law in that they both alleged age discrimination by their employer, their cases involved entirely different sets of facts. They were employed in different divisions of the defendant company that "were operated independently . . . with virtually no interchange of personnel." *Id.* at 1155, 1986 WL 11608, *6. By contrast, the present case involves common questions of law and fact and arises out of the same series of occurrences. Although Cusimano and Ward were not employed at CSOS at the same time, they allege harassment by the same individual. Each Plaintiff's case depends on allegations that the Co–Director (Jim McPartland), the Assistant Director (John Hollifield), and a supervisor (Barbara Colton) had notice of harassment by Christian, yet continuously failed to remedy it.

In *King v. Ralston Purina Co.,* the court allowed joinder of three plaintiffs who worked in different divisions of the defendant company because "each alleges that he was discriminated against as part of a pattern and practice of unlawful age discrimination conducted by defendant. . . ." 97 F.R.D. 477, 480 (W.D.N.C.1983). Similarly, in this case, Cusimano and Ward allege a pattern of sexu-

al harassment that the supervisors at CSOS continuously tolerated. *See Duke v. Uniroyal Inc.,* 928 F.2d 1413, 1421 (4th Cir.) (affirming the lower court's denial of the defendant's motion for severance where the two plaintiffs, who alleged age discrimination and were both discharged as a result of the same reduction in force policy, raised common questions of law and fact), *cert. denied,* — U.S. ——, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991); *Blesedell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1422 (S.D.N.Y.1989) (allowing joinder of plaintiffs where "all of the plaintiffs allege that they had been injured by the same general policy of permitting discrimination against women"). Because Cusimano's and Ward's claims arise out of the same series of occurrences and raise common questions of law and fact, their cases are properly joined under Fed.R.Civ.P. 20(a).

The Court notes that any undue prejudice to the University can be eliminated at trial by giving the jury a limiting instruction. *See Duke,* 928 F.2d at 1421 (noting that the district court prevented prejudice by giving the jury a limiting instruction); *Hanley v. First Investors Corp.,* 151 F.R.D. 76, 80 (E.D.Tex.1993) (denying motion for severance and noting that jury prejudice and confusion can be prevented by limiting instructions). In *Hanley,* the court explained:

> [I]t seems well within the jury's abilities to distinguish between the idiosyncracies of each case. They will be instructed to keep each plaintiff's claim separate, and to force each plaintiff to prove his or her claim and damages separately. In addition, they will be instructed that the mere presence of several plaintiffs does not permit an inference of liability.

*Id.* This Court has equal faith in the abilities of the jury to follow similar instructions. The Court will therefore deny the University's motion for severance.

## V. CONCLUSION

For the reasons stated above, the Court will grant the University's motions for summary judgment with respect to Ward's claim of retaliation and both Plaintiffs' prayer for injunctive relief; deny the University's motions for summary judgment on all other issues; deny the University's motion for severance; and deny Plaintiffs' and Defendant's motions to strike. A separate Order will issue.

### ORDER

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this 22nd day of April, 1994, by the United States District Court for the District of Maryland, ORDERED:

1. That Defendant's Motion for Severance (Paper No. 54) is hereby DENIED;

2. That Defendant's Motions for Summary Judgment as to Beth E. Ward (Paper No. 65) and as to Theresa Cusimano (Paper No. 66) are hereby GRANTED IN PART AND DENIED IN PART as follows:

 a. Plaintiff Beth Ward's claim of retaliation is hereby DISMISSED;

 b. Plaintiffs' prayer for injunctive relief, Paragraphs VI.D and VI.E of the Third Amended Complaint, are hereby DISMISSED;

 c. Defendant's Motions for Summary Judgment are, in all respects not otherwise indicated herein, DENIED;

3. That Defendant's Motion to Strike Affidavits and Photographs (Paper No. 76) is hereby DENIED;

4. That Plaintiffs' Motion to Strike Exhibits 25 and 27 (Paper No. 79) is hereby DENIED.