**Lari P. SCRUGGS, Plaintiff,**

**v.**

**Nadine KEEN, et al., Defendants.**

**Civ. A. No. 94–0015–D–R.**

United States District Court,
W.D. Virginia,
Roanoke Division.

July 19, 1995.

Thomas Keister Greer, Rocky Mount, VA, William Carrington Thompson, Law Office of William C. Thompson, Chatham, VA, for plaintiff.

James Edward Ghee, James E. Ghee, Farmville, VA, Arelia Smith Langhorne, Lynchburg, VA, for Nadine Keen, Linda Edwards–White.

Dorothy Louise Dillon, Law Office of Dorothy P. Dillon, Rocky Mount, VA, for Kelly M. Steele, Elizabeth A. Abshire.

William David Paxton, John Christopher Clemens, Gentry, Locke, Rakes & Moore, Roanoke, VA, for William B. Gibson, Leonard A. Gereau, County School Board of Franklin County.

## MEMORANDUM OPINION

KISER, Chief Judge.

Before the Court is the motion of the defendants Leonard Gereau, William Gibson, and the School Board of Franklin County (the "school board defendants") for summary judgment. These defendants previously filed a summary judgment prior to the commencement of discovery, which I denied. The parties have briefed the issues involved in the renewed motion and the Court heard arguments of counsel. The school board defendants' motion is, therefore, ripe for disposition. For the reasons that follow, the motion will be granted in part and denied in part.

FACTS:

Plaintiff brings this suit under 42 U.S.C.A. § 1983 (West 1994). Plaintiff claims that the school board defendants deprived her of due process and First Amendment rights. Plaintiff was a mathematics teacher at Franklin County High School ("FCHS") during the school year 1992–1993. She also presided over study hall on occasion. In February 1993, plaintiff was in her second year of teaching at FCHS. She was a probationary status teacher teaching under a year-to-year contract.

On February 3, 1993, plaintiff was supervising a study hall. Kelly Steele and Elizabeth Abshire, two students in the study hall,[1] approached plaintiff to request a hall pass to purchase tickets for a Black History Month assembly. Plaintiff denied the request as the principal of FCHS, defendant Gibson, had announced that tickets could be purchased between classes or during lunch.

A conversation between plaintiff, Abshire, and Steele ensued. It turned toward the topic of interracial dating when the students asked plaintiff for her comments on the subject. The content of the plaintiff's remarks is hotly debated between the parties. About the only undisputed fact is that her remarks

---

1. Abshire and Steele were originally named as co-defendants in this lawsuit. The plaintiff, however, has since advised that these individuals will be dismissed from the lawsuit.

indicated she did not favor interracial dating and that the students could have interpreted her remarks to mean that whites "lowered themselves" when they dated blacks. Abshire reported that plaintiff used a racial slur to describe blacks and an upcoming assembly being held for Black History Month. Plaintiff denies using the slur. Plaintiff also stated that interracial dating could cause problems, suggesting that interracial dating was the cause of recent fights in the school. Plaintiff maintains she was sharing her personal opinion on the topic. She did not know if Steele dated a black person, but did know, after Steele told her, that Steele's sister was dating a black male student. Scruggs Dep. at 84. Plaintiff did not know this, however, until after she shared her opinion on interracial dating. *Id.*

Prior to the events of February 3, 1993, interracial dating was not a topic frequently discussed. It never arose in school board meetings. No concerns about interracial dating were ever brought to the attention of Gereau. There were no newspaper articles discussing this issue. At the same time, however, it appears that the topic may have been à subject of student concern at FCHS. This conclusion flows from the "Evans Incident." There, a teacher was required to abandon his lesson plan for the day to allow students to discuss racism. A report of a student fight over race sparked the discussion.

Defendant Nadine Keen, an English teacher at FCHS during the 1992–1993 academic year, reported the study hall conversation to the school administration. Abshire told Keen of the conversation. On February 4, 1993, Gibson and Kevin Bezy, an assistant principal at FCHS, met with the plaintiff. At this meeting, they confronted plaintiff with the written statements of Abshire and Steele, obtained earlier that day, regarding what was said in the conversation. Abshire's and Steele's statements were obtained separately. Gibson and Bezy allowed the plaintiff to respond to the students' version of the conversation. Plaintiff admitted making certain comments, could not remember making others, and denied making others.

On February 5, Gibson and Bezy again met with the plaintiff. They read a summary of the prior day's meeting to her, which she indicated was accurate. Then, citing the potential disruptiveness of her comments, Gibson and Bezy notified plaintiff she would be suspended until further notice. She was later notified the suspension would be with pay, for three days. Plaintiff filed no grievance, as she could have under FCHS procedures, over this action.

The administration's reaction did not stop with the three-day suspension. Later on February 4, Gibson met with defendant Gereau, the Division Superintendent, and Florella Johnson, Associate Superintendent. Gereau decided at this time to recommend nonrenewal of plaintiff's teaching contract. Gereau sent a letter to plaintiff informing her of this action on February 24, 1993.

This letter informed plaintiff of her procedural rights in relation to the nonrenewal decision.. Specifically, the letter indicates plaintiff may, upon written request, seek the reasons for the decision and, after receiving those reasons, request a conference with Gereau. Plaintiff requested such a conference and one was held on March 10, 1993. This meeting took place between plaintiff and Johnson, Gereau's designee.[2]

The media became involved in this event in March 1993 as a result of actions of defendant Keen and defendant Linda Edwards–White. Defendant Edwards–White learned of plaintiff's comments at a barber shop. She contacted a television station and wrote to the Virginia Department of Education to request an investigation. Plaintiff concedes that the school board defendants were not responsible for divulging the situation to the media.

As a result of the media coverage, concerns of racial tension at FCHS arose. The

2. Va.Code Ann. § 22.1–305(B) (Michie 1993) allows the superintendent to designate another administrator to attend this conference, so long as the designee was not involved in the decision to recommend nonrenewal. While Johnson was apparently present at the time the decision to renew was made, the plaintiff presents no evidence as to what Johnson may have said or did at this meeting.

local sheriff's office was contacted. Keen reported threats against her and vandalism of her car. This prompted Gibson to place both Keen and plaintiff on a 10–day administrative leave with pay. The leave started on March 15, 1993. Safety concerns motivated this action. The plaintiff filed no grievance.

Plaintiff met with Gereau on March 19 to discuss the nonrenewal decision. Gereau discussed the possibility of resignation with plaintiff at this time. Gereau maintains he did not pressure plaintiff to resign. Plaintiff ultimately did resign, indicating her desire to do so in a typed letter dated March 19. There is some dispute as to when this letter was actually tendered. Gereau maintains it was on March 19 while the plaintiff claims it was March 24. Prior to deciding to resign, the plaintiff consulted Gary Waldo, an official with the Virginia Education Association, as well as her then-counsel. She also discussed the situation with her husband.

On March 25, the school board issued a press release. It does not mention plaintiff's resignation or Gereau's nonrenewal decision. It does indicate that there has been "no increase in discipline problems at [FCHS]." Toward the end of plaintiff's tenure, her teaching performance was evaluated. That evaluation reflected positive performance and indicated good relationships with students.

DISCUSSION:

### I. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is

entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### II. Due Process Claim

█ Assuming, *arguendo*, that plaintiff has a liberty interest to protect,[3] she received all the process that she was due. The minimum requirements of due process are notice and "some kind of hearing" prior to being suspended. *Garraghty v. Jordan*, 830 F.2d 1295, 1300 (4th Cir.1987). Affording the public employee the full panoply of rights that a criminal defendant is entitled to is not required. *Riccio v. County of Fairfax*, 907 F.2d 1459, 1465 (4th Cir.1990). The formalities required may vary depending on the importance of the interests involved and the nature of any subsequent proceedings. *Garraghty*, 830 F.2d at 1300; *Grimes v. Nottoway County Sch. Bd.*, 462 F.2d 650, 653 (4th Cir.) ("The sufficiency of the procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved."), *cert. denied*, 409 U.S. 1008, 93 S.Ct. 439, 34 L.Ed.2d 300 (1972).

█ Addressing each possible deprivation seriatim, I turn first to the three-day suspension. At the outset, it is important to note that no significant interest is implicated. The plaintiff was suspended with both her pay and benefits intact. Other courts have held that this type of "deprivation" is insufficient to trigger any right to procedural protection. *Fields v. Durham*, 909 F.2d 94, 98 (4th Cir.1990) (holding that no deprivation exists so long as employee receives payment of full compensation due under the employment contract), *cert. denied*, 498 U.S. 1068, 111 S.Ct. 786, 112 L.Ed.2d 849 (1991); *Carter v. Western Reserve Psychiatric Habilitation Ctr.*, 767 F.2d 270, 272 (6th Cir.1985) (two-

---

**3.** She clearly has no protectable property interest. She is a probationary teacher who was not fired during the term of her contract.

day suspension with pay). These courts conclude that *de minimis* infringements of this nature do not implicate due process concerns. *Cf. Garraghty,* 830 F.2d at 1299 (five-day suspension without pay triggered due process requirements).

■ In light of the deprivation, plaintiff received more than adequate process. Gibson and Bezy afforded her the opportunity to respond to the students' accounts of the study hall incident. They indicated to her that the matter was one of serious concern to the administration. They decided upon an action and allowed the plaintiff a second opportunity on the following day to disagree with the factual basis for their action. Given the plaintiff's minimal interest, this hearing was adequate. Furthermore, the availability of a thorough grievance procedure, which could have handled this suspension, provided adequate post-deprivation procedural protection. *See Holland v. Rimmer,* 25 F.3d 1251, 1259 (4th Cir.1994) (pretermination opportunity to respond coupled with state grievance procedure provided employee with adequate due process); *Crocker v. Fluvanna County Bd. of Pub. Welfare,* 676 F.Supp. 711, 717 (W.D.Va.1987) (Kiser, J.) (plaintiff received adequate due process where pre-termination hearing held with notice and opportunity to respond and post-termination grievance procedure existed, which plaintiff chose not to pursue), *aff'd,* 859 F.2d 14 (4th Cir.1988). *See also Fuller v. Laurens County Sch. Dist. No. 56,* 563 F.2d 137, 140 (4th Cir.1977) (employees waived due process challenge where they rejected an offer of a hearing before the school board after consulting with friends and attorney).[4]

■ The nonrenewal decision is the next potential deprivation. Again, adequate procedures were provided. As the superintendent was required to do under state law, *see* Va.Code Ann. § 22.1–305 (Michie 1993), he sent plaintiff a written notice of his decision to recommend nonrenewal. That letter advised plaintiff of her right to a conference with the superintendent or his designee. Such a conference was held on March 10, 1993, between plaintiff and Johnson. On

March 19, Gereau himself met with plaintiff, a step not required in the statute. Even if plaintiff resigned on March 24, this resignation was prior to the time the school board was obligated to provide notice of nonrenewal. Thus, viewed in the light most favorable to the plaintiff, her resignation halted the process she would have received. To the extent state law was not complied with, it may provide a breach of contract action. *See Dennis v. County Sch. Bd. of Rappahannock County,* 582 F.Supp. 536, 540 (W.D.Va.1984). It does not indicate that constitutionally required due process was denied.

■ Finally, the 10–day administrative leave decision did not deprive plaintiff of due process. There was, admittedly, no prior notice to the plaintiff regarding this action. However, the action was not intended to be punitive, but instead imposed for safety reasons. Indeed, the plaintiff requested, the day of her return, to be escorted to her car after school. Furthermore, in weighing the nature of the deprivation, I conclude that the availability of the grievance procedure for this decision, which plaintiff did not utilize, was sufficient process. *See Fields,* 909 F.2d at 98; *Fuller,* 563 F.2d at 140 (failing to pursue available process waives due process challenge).

### III. First Amendment Claim
#### A. Recent Cases

I turn now to the difficult issue in this case, the alleged First Amendment violation. At the outset, I am confronted with the Supreme Court's decision in *Waters v. Churchill,* —— U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). The defendant argues that it is directly on point and disposes of the First Amendment issue. The plaintiff maintains that the decision is distinguishable. After reviewing *Waters,* and cases applying it, I conclude that both parties interpret *Waters* incorrectly.

In *Waters* the central focus of the Court was whether the test in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), should be applied to what the government employer thought was said or to what

---

**4.** As defendants properly note, this is not an   exhaustion of remedies argument.

the trier of fact ultimately determines to have been said. —— U.S. ——, 114 S.Ct. at 1882.[5] *Waters* involved a hospital that fired one of its employees, Churchill, after a conversation with a coworker, Perkins–Graham. During the conversation, Churchill allegedly made negative comments regarding working conditions and about her supervisor, Waters. At the time of the conversation, Perkins–Graham was considering transferring to the department in which Churchill worked. Three other employees overheard the conversation. One of them, Ballew, remembered it as Perkins–Graham did, the other two agreed with Churchill's version, which had Churchill commenting on the hospital's cross-training policy. Churchill maintained that the policy threatened patient care in the hospital. Churchill had made negative comments about this policy in the past as well.

Justice O'Connor, writing for a plurality but nonetheless setting out the opinion of the Court,[6] held that not only must the substantive First Amendment *Connick* standards be met, but they must also be applied through reliable procedures. *Id.* at ——, 114 S.Ct. at 1884. Therefore, Justice O'Connor recognized that certain procedural safeguards are required by the First Amendment. The propriety of the safeguard required will vary on a case-by-case basis, but an examination of the relationship between the cost of the procedure and the relative magnitude and constitutional significance of the risks assist in making this determination. *Id.* at ——, 114 S.Ct. at 1886.

Justice O'Connor went to great lengths to explain the basis for differing treatment of the government as employer and the government as sovereign. In its latter role, the government is much more limited in the type of speech it may regulate, in recognition of the principle that public debate should be uninhibited, robust and wide-open. *Id.* (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)). In its former role, however, the Court has never told the government it must rely upon "counter-speech" when an employee counsels her coworkers to do their job in a way in which the government as employer disagrees. Rather, the government can simply tell her to stop. *Id.* Government predictions of harm are also given greater deference when it is an employee's speech being regulated than when a citizen's speech is regulated. *Id.* —— U.S. at ——, 114 S.Ct. at 1887. However, given that government employees do not lose all of their First Amendment rights when they come to work, the government may have to make a "substantial showing" that the speech is, in fact, likely to be disruptive before it may be punished. *Id.*[7]

The Court of Appeals had decided that the employer's factual conclusions were irrelevant, and that the jury should engage in its own fact finding. *Id.* at ——, 114 S.Ct. at 1884. In rejecting the Court of Appeals approach, Justice O'Connor concluded that a middle ground was advisable. Rather than accepting the employer's determinations without question, it is necessary to determine the reasonableness of those conclusions. *Id.* at ——, 114 S.Ct. at 1889. Indeed, it is "necessary that the decisionmaker reach its conclusion about what was said in good faith, rather than as a pretext." *Id.*

---

5. *Waters* applies because the content of the conversation, beyond the mere fact that it involved interracial dating, is in dispute.

6. Justice Souter in his concurring opinion notes that the plurality opinion's reasonableness test should be taken as the holding of the Court because a majority believes that an employer whose conduct survives the reasonableness test is not liable and a different majority concludes that an employer whose conduct fails the reasonableness test is liable.

7. Interestingly, the Court never cites *Tinker v. Des Moines Independent School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In *Tinker,* the Court addressed the potential disruption concept in the context of a high school student's wearing of an arm band to protest the Vietnam War. After reviewing both *Tinker* and *Waters,* I conclude that they are distinguishable. *Tinker* was not a school employee case. The effort the *Waters* Court expended to explain the difference between the government as employer and the government as sovereign illustrates the significance of this distinction. The dicta in *Tinker,* however, would imply that had a teacher been one of the plaintiffs, the First Amendment would have protected her wearing of an arm band.

If an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with a certain amount of care. This need not be the care with which trials, with their rules of evidence and procedure, are conducted. It should however, be the care that a reasonable manager would use before making an employment decision—discharge, suspension, reprimand, or whatever else—of the sort involved in the particular case.

*Id.*

Turning to the facts in *Waters*, Justice O'Connor held that if the employer "really did believe" Perkins–Graham's and Ballew's version and fired Churchill because of it, the employer must win. Their belief was based upon a reasonable investigation. Waters interviewed Perkins–Graham and Ballew before acting. Churchill filed a grievance and was then given an opportunity to give her version of the conversation. Ballew was again interviewed. After these actions, a reasonable manager could have concluded that no further investigation was warranted.

Furthermore, the speech as reported was unprotected. Although the Court assumed it was on a matter of public concern, the Court held that the potentially disruptive effect of the speech was sufficient to outweigh Churchill's interest. The disruption came from encouraging Perkins–Graham not to transfer to the department as well as from negative comments regarding Waters. As a matter of law, this disruption was enough to outweigh the employee's interest in making the speech.

These conclusions, however, did not warrant affirmance of the district court's grant of summary judgment. Rather, an issue of fact still existed over whether Churchill was "actually fired because of [the unprotected statements discussed above], or because of something else." *Id.* at ——, 114 S.Ct. at 1891. The "something else" was prior comments on the cross-training policy that might have been protected speech. The employer's actual motivation was a material issue of fact

and required that the summary judgment motion be denied.

At least in those cases in which the content of the employee's speech is disputed, *Waters* marks a significant new approach in the law. The test that should be applied is not altogether clear. Unfortunately, there has not been significant appellate guidance following the decision, but one circuit decision does recognize the effect of *Waters*. In *Jeffries v. Harleston*, 52 F.3d 9 (2d Cir.1995), the district court entered judgment for the plaintiff after a jury trial with special interrogatories and the Second Circuit affirmed. Subsequently, the Supreme Court vacated the decision and remanded following *Waters*. On remand, the Second Circuit reversed its prior decision. The employee, a black university professor at City College of New York, had given a speech that addressed bias in the New York public school system. In the speech, he made derogatory comments, particularly about Jews. *Id.* at 11. Several members of the Board of Trustees arranged a meeting to vote on whether to limit the plaintiff's tenure as department chair to one year instead of the usual three. The effort succeeded.

The court read *Waters* to hold that the closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that speech is likely to be disruptive. *Id.* at 13 (citing *United States v. National Treasury Employees Union*, —— U.S. ——, ——, 115 S.Ct. 1003, 1021, 130 L.Ed.2d 964 (1995) (O'Connor, J., concurring in part, dissenting in part)). There is a resultant proportionality between the nature of the speech and the nature of the sanction that may ensue. *Jeffries*, 52 F.3d at 13. The court also recognized that the employer need only show the likelihood of disruption, not actual disruption. *Id.* The court continued:

Whittled to its core, *Waters* permits a government employer to fire an employee for speaking on a matter of public concern if: (1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action

against the employee based on this disruption and not in retaliation for the speech. *Id.*

### B. The Standard

■ After considering *Waters* and *Jeffries,* I have concluded that a different standard is now required in cases where the content of the employee's speech is disputed. The first element of the inquiry is to determine whether the speech at issue is on a matter of public concern. This is historically the threshold inquiry in any speech-related employment case. *See Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983); *Holland v. Rimmer,* 25 F.3d 1251, 1254 (4th Cir.1994); *Stroman v. Colleton County Sch. Dist.,* 981 F.2d 152, 156 (4th Cir.1992). Determining whether the speech is on a matter of public concern is a matter of law for the court to decide. *Stroman,* 981 F.2d at 156. The burden is on the employee to show that her speech is constitutionally protected. *Holland,* 25 F.3d at 1254. The *Jeffries* court even recognized this as a threshold determination. 52 F.3d at 13. This approach is also analytically consistent. If the speech is not on a matter of public concern, the employee may be fired because of it. No further analysis is necessary. *See Holland,* 25 F.3d at 1255 n. 10.

■ The second inquiry is to determine whether the employer conducted an adequate investigation of the alleged speech. *Waters,* — U.S. at ——, ——, 114 S.Ct. at 1886, 1889. The employer must act with the care that a reasonable manager would exercise before making an employment decision. *Id.* at ——, 114 S.Ct. at 1889. There must be some relationship between the type of investigation and the severity of punishment anticipated. *See id.; Jeffries,* 52 F.3d at 13 (proportionality between nature of speech and nature of sanction required). This determination aids in ascertaining whether the employer's prediction of harm flowing from the speech, be it disruption between workers or loss of effective or efficient delivery of service, was reasonable. *Cf. Jeffries,* 52 F.3d at

13 (prediction of disruption had to be reasonable). Justice O'Connor provided no guidance in the *Waters* plurality about whether this is a question of law or of fact. *Waters,* — U.S. at ——, 114 S.Ct. at 1897 (Scalia, J., concurring). On the one hand, the "reasonable manager" test sounds like one suited for jury resolution. On the other hand, to the extent that the inquiry assists in determining the meaning and application of the First Amendment, precedent suggests that this is a question of law. *Wright v. Illinois Dep't of Children & Family Servs.,* 40 F.3d 1492 (7th Cir.1994). Given the Court's explicit use of a "reasonable man" standard, I conclude this is a jury question.

■ If the investigation is reasonable,[8] then the next step in the inquiry is to balance the employee's interest in speaking against the employer's interests in preventing the speech. The burden of proof at this point is upon the employer, not the employee. *Connick,* 461 U.S. at 150, 103 S.Ct. at 1691 (noting, however, that employer's burden varies depending upon nature of employee speech). Relevant factors to consider on this issue include: (1) the impact of the speech upon co-worker harmony; (2) whether the speech impedes the performance of the speakers' duties or interferes with the regular operation of the enterprise; and (3) whether the statement interferes with the public employee's functions. *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). Additionally, given the importance of public education, the state has a significant interest in maintaining a professional and dedicated teaching staff to teach its young citizens. *See Stroman,* 981 F.2d at 158. The potential for disruption from an employee's remarks may also be taken into account. *Waters,* — U.S. at —— ——, 114 S.Ct. at 1890–91. However, where the employee's speech is closely related to matters of public concern, the employer's showing of likely disruption necessarily increases. *Jeffries,* 52 F.3d at 13. Indeed, when the employee has a strong, legitimate interest in speaking out on public

---

8. The Court was unclear on the consequences of finding an unreasonable investigation. It would be inappropriate at this stage to speculate about

the result of such a finding. Rather, the effect will be left to future briefing and decision.

matters, the government may have to make a "substantial showing" that the speech is, in fact, likely to be disruptive before it may be punished. *Waters,* —— U.S. at ——, 114 S.Ct. at 1887.

Assuming that the plaintiff survives the balancing test, and thereby proves that the speech was entitled to First Amendment protection, the plaintiff must finally prove that she was fired because of that speech. This inquiry raises the issue of pretext. Thus, the plaintiff must prove that the employer took action against the employee in retaliation for the speech and not based on the potentially disruptive effects of the speech. *See Jeffries,* 52 F.3d at 13. For example, in this case, it may be that plaintiff was fired to eliminate the possibility of public criticism and not because of the potential disruption of her comments. *See Berger v. Battaglia,* 779 F.2d 992, 1000–01 (4th Cir. 1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986). Determining whether plaintiff has satisfied this burden is a question of fact. *Hughes v. Bedsole,* 48 F.3d 1376, 1386 (4th Cir.1995); *Wright,* 40 F.3d at 1506–07. If the jury concludes that plaintiff's punishment was in part impermissibly motivated, the defendant may prevail only if it can show that plaintiff would have been suspended anyway for reasons unrelated to her speech. *Wright,* 40 F.3d at 1507; *see Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Hughes,* 48 F.3d at 1386 n. 11 (explaining relationship between "but for" and *Mount Healthy City Sch.* tests).

### C. Application of the Standard
#### 1. Public Concern

Plaintiff's speech in this case was on a matter of public concern. To determine whether particular speech is on a matter of public concern, the content of the speech is important. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. Speech whose content is designed to bring to the public's attention instances of official misconduct or breaches of public trust is more likely to be protected than speech on matters of personal interest. *Jurgensen v. Fairfax County,* 745 F.2d 868, 879 (4th Cir.1984). The context of the speech is also important. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. Speech in a public forum is more likely to be protected than speech in a private conversation. *Smith v. Fruin,* 28 F.3d 646, 652 (6th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995). However, this inquiry is not dispositive. Speech that occurs in a private conversation may indeed be protected speech. *Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979) (employee speaking in private to supervisor). *Cf. Waters,* —— U.S. at ——, 114 S.Ct. at 1883 (employees speaking amongst themselves); Speech of public concern may also be "fairly considered as relating to any matter of political, social or other concerns of the community." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690; *Feldman v. Philadelphia Hous. Auth.,* 43 F.3d 823, 829 (3d Cir.1994); *Berger,* 779 F.2d at 999 (focus is on whether public or community would be truly concerned with or interested in the particular expression). *But cf. Smith,* 28 F.3d at 651 (holding that just because speech is of general public interest does not make it a matter of public concern).

The plaintiff in this case made negative comments about interracial dating. Comments on racial discrimination are, generally speaking, matters of public concern. *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690 (interpreting *Givhan* for this proposition). Speech potentially insulting to a certain group is protected. *Berger,* 779 F.2d at 999 (plaintiff performed imitation of Al Jolson in blackface makeup and a black wig). Thus, it would appear on a general level that plaintiff's speech is on a matter of public concern to the extent it involves issues of race relations.

Defendant maintains, however, that the plaintiff's failure to point to any public debate of interracial dating precludes finding that plaintiff's speech was on a matter of public concern. I believe defendant is wrong for two reasons. First, defendant focuses too narrowly on the speech at issue. The speech was more than just a comment about

dating. It was a comment upon the status of race relations generally.

Second, and more importantly, it ignores facts in the record. There was an impending Black History Month program, at which a motivational speaker was to make some remarks. There was racial tension in the school before the plaintiff's comments. Defendant Keen had resigned her position, and in her letter of resignation addressed racial concerns at FCHS. Keen Dep. at 59; Edwards–White Dep. at 74. Moreover, some black parents in the community were already concerned with the school system's treatment of black students. Johnson Dep. at 38–39, 43; Edwards–White Dep. at 29. This evidence strongly suggests that race issues were a matter of concern in the community and in particular at FCHS.

Indeed, there is evidence that interracial dating itself might have been a matter of public concern, at least for the students at FCHS. The day after plaintiff made her comments, a fight occurred. Some students believed that it was racially-motivated. Plf. Mem. in Opp. to Summary Judgment Ex. A at 12–13. This lead to additional upset at FCHS and caused a teacher to devote his class period to a discussion of the event. The discussion was later dubbed the "Evans Incident." Even though the fight and the resulting discussion occurred after plaintiff made her comments, plaintiff's comments were not mentioned by any of the students in the ensuing class discussion. This indicates that race relations were a concern amongst the students of FCHS and that concern predated the plaintiff's comments. Accordingly, even under the school board defendants' strict view, the plaintiff was speaking on a matter of public concern.

Plaintiff's choice of forum does not alter my conclusion. Plaintiff made her comments while supervising a study hall. She was talking with only two students, suggesting a private conversation. But *Givhan* is clear that a private conversation does not preclude finding a matter of public concern. *Cf. Waters,* —— U.S. at ——, 114 S.Ct. at 1882–83. Additionally, study hall was apparently used for more purposes than just studying. One of the students in the conversation testified that different discussions occurred in study hall everyday. Abshire Dep. at 18. Indeed, one of the students in the conversation went on to discuss another "hot button" issue of our time: homosexuals in the military. Scruggs Dep. at 87. Thus, study hall occasioned comments on several different issues. I do not believe that a public school teacher, when asked by a student for guidance or comment on important social issues of the day, must stand mute. Rather, she may offer her views and encourage discussion of different views. *Cf. Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) (protecting constitutional freedoms is most vital in American schools). *See also Dambrot v. Central Mich. Univ.,* 55 F.3d 1177, 1190, 1995 U.S.App. LEXIS 13615, at *35 (6th Cir.1995) (classroom teacher's primary role is to guide students through the discussion and debate of various viewpoints in a particular discipline).[9] The teacher involved in the Evans Incident did exactly this and the school's investigation cleared him of any wrongdoing. This case is different from *Dambrot,* a case defendant relies upon. That case involved a basketball coach's use of the word "nigger" in a locker-room pep talk. The use of the slur was also admitted. The plaintiff here, by contrast, has denied using the slur and was engaged instead in sharing views on interracial dating at the request of one of the students.

### 2. Investigation

▆ Satisfied that plaintiff's speech was on a matter of public concern, I turn now to the question of whether the investigation by Gibson and Gereau was reasonable. Had the only punishment meted out been a three-day suspension, this would not be a difficult decision. I believe there is no dispute of material fact that for purposes of a suspension decision, this investigation was reasonable. Not only is there proportionality between the punishment and the investigation, *Jeffries,* 52 F.3d at 13, but Gibson and Gereau acted as reasonable managers if suspension was the only punishment contemplated. However,

---

9. Apparently, Gereau also places importance on the fact that plaintiff was asked her views on this issue rather than volunteering them. *See* Plf. Mem.Ex. A at 11–12.

the school board defendants were not satisfied with a mere suspension. Instead, Gereau concluded that plaintiff's contract should not be renewed. This step clearly has more serious and far-reaching implications for the plaintiff than does a three-day suspension with pay. The disingenuous suggestion of the school board defendants that Gereau's action was *merely* to *recommend* nonrenewal of the plaintiff is not persuasive.

Gereau's decision was based upon the plaintiff's "lowering selves" comment. Gereau Dep. at 11. Gereau concluded from this comment that plaintiff could not "teach in a classroom all children with that type of belief." *Id.* at 13. He also thought that plaintiff would not have "credibility" with kids and that she would not treat all children equally after admitting to the "lowering selves" comment. *Id.* at 22 & 58. Gereau did not, however, take a wait-and-see attitude towards plaintiff's effectiveness as a teacher. Instead, he decided immediately that nonrenewal was an appropriate step.

If the school board defendants really did believe plaintiff had made the "lowering selves" comment and acted against plaintiff on that basis, then there can be no issue of material fact as to the investigation's reasonableness. *Cf. Waters,* —— U.S. at ——, 114 S.Ct. at 1884 (employer must reach its conclusion about what was said in good faith); *id.* at ——, 114 S.Ct. at 1890 (if employer really did believe witnesses' stories and fired employee because of them, employer must win). As in *Waters,* the school board defendants sought to uncover the actual words used. Gibson obtained written statements from all students involved in the conversation. He then confronted the plaintiff with those statements and gave her the opportunity to respond. The "lowering selves" comment was corroborated by both students and, at the time, the plaintiff. Unlike the investigation in *Waters,* which was found to be sufficient as a matter of law, Gibson's investigation involved all of those in the conversation. There is no suggestion that anyone else overheard the conversation.

If, however, the school board defendants actually believed that plaintiff said "nigger" and acted against plaintiff on that belief, then there is a material issue of fact as to the investigation's reasonableness. Gibson's investigation revealed only Abshire's recollection of the use of a racial slur. Steele did not remember—it was her sister, after all, that was dating a black young man—and plaintiff denied such usage. *Waters,* with its implicit concern for proportionality, might require a reasonable manager, contemplating what is essentially a termination based upon the use of the slur, to engage in additional investigation. For example, a jury could reasonably conclude that a reasonable manager would investigate Abshire's credibility or would examine more closely events that transpired after the conversation with plaintiff, such as the encounter with Clayborne. This is especially so when Abshire's recollection is essentially uncorroborated.

At least two pieces of evidence currently in the record suggest that the school board defendants acted based upon the use of the slur, rather than the "lowering selves" comment. First, the precipitous decision not to renew by itself suggests that something quite inflammatory motivated the decision. Second, Gereau himself, in an April 28, 1993 letter, recognizes that there had never been complaints or criticisms of plaintiff on racial matters prior to February 3, 1993. Based on this evidence, there is a material question of fact as to what the school board defendants believed plaintiff said.[10]

### 3. Balancing

■ Assuming that the jury would find in defendant's favor on the above point, I next consider whether defendant has met its burden to show that its interest as employer outweighs the interest of plaintiff. At the outset, I note that plaintiff has a strong interest in being allowed to speak. First, she was responding to a student's question. Defendants' protestations notwithstanding, I believe this is relevant in this case. *See supra* note 9 (discussing Gereau's apparent disagreement with counsel on this point). A

---

**10.** The material question is *not* whether the slur was *actually* used, but whether the school board defendants believed it was used.

teacher's responsibility is to educate. The school board defendants attempt to narrow this responsibility to education in math because plaintiff was a math teacher. This is certainly the plaintiff's primary job function. But her responsibility in study hall, *de facto* or otherwise, is to guide students in their studies and in their deportment. If a question involves mathematics, so much the better. But if the question involves an important social issue, especially one of concern to the general public, the teacher need not remain silent or, as defendants' counsel suggested, refer the student to a guidance counselor. Rather, the teacher has the right, and perhaps the duty, to respond and to respond appropriately. If plaintiff used a racial slur, then perhaps she would not be entitled to protection.[11] But viewing the facts in the light most favorable to plaintiff, plaintiff responded as best she could to a sensitive subject. *Cf. Feldman,* 43 F.3d at 831 (holding that even though speech caused disruption, employee was performing precisely the task he was assigned to do as an employee and thus balancing test favored employee).

Second, her speech closely reflected on matters of public concern. There were at least ten separate incidents that had concerned some black parents in Franklin County. Edwards–White Dep. at 29–30. Indeed, interracial dating was a matter of concern to some students. The school board defendants' assertions that they were unaware of such tensions indicates, when viewed in the light most favorable to the plaintiff, only an out-of-touch school administration. The testimony of Edwards–White supports this view. *Id.*

The defendant relies on the potential for disruption, citing both *Waters* and *Jeffries.*

Given the strong interest of the plaintiff, however, the school board defendants must make a substantial showing that the speech is likely to be disruptive. *Jeffries,* 52 F.3d at 13. The school board defendants have not removed this from the realm of being a disputed issue of fact.[12] At the outset, it should be remembered that the school board defendants do not rely upon plaintiff's use, if any, of the racial slur. They maintain it is not a material fact and Gereau, as pointed out above, stressed the "lowering selves" comment in his decision-making. Thus, the potential for disruption must come from that comment and the other comments plaintiff admitted to making at the time.

Strong evidence of a lack of likely disruption is the lack of actual disruption. *See Watters v. City of Philadelphia,* 55 F.3d 886, 896, 1995 U.S.App. LEXIS 13560, at *29 (3d Cir. June 2, 1995). There is no evidence of any disruption immediately after February 3. The defendant relies upon the comment of Abshire in her written statement regarding who can be trusted in light of such comments. But this comment was made after Abshire engaged in what she herself described as a very upsetting and emotional conversation with Tomeka Clayborne, during which plaintiff's comments were discussed. Her state of mind immediately after the incident was one of mild offense. Abshire Dep. at 18. Steele made no such notation in her written report. She testified in her deposition that plaintiff's response did not upset nor insult her. Steele Dep. at 7.

Furthermore, the disruption school officials were apparently worried about was not legitimately considered under applicable Fourth Circuit precedent. It is well-established that threatened disruption by others

---

11. Indeed, if the racial slur were used, it would arguably not be protected. Even in cases where the government regulates speech as a sovereign, speech containing "fighting words" is not given protection. *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). *See Berger,* 779 F.2d at 1001 (holding that speech containing direct incitement to violence would not be within First Amendment protection).

12. In so holding, I do not relinquish my role in balancing the interests of employer and employee. Rather, like in qualified immunity situations, I conclude that the balance turns on a disputed issue of fact properly submitted to a jury. *See DiMeglio v. Haines,* 45 F.3d 790, 795 (4th Cir. 1995); *Jackson v. Bair,* 851 F.2d 714, 718 (holding that ultimate issues of constitutional law like "public concern" determination and balancing test often embrace subsidiary issues of "pure historical fact"), *opinion withdrawn and district court aff'd by equally divided court,* 863 F.2d 1162 (4th Cir.1988).

as a result of speech may not serve as a justification for public employer discipline. *Berger*, 779 F.2d at 1001. The disruption must come from the speech itself. *Id.* at 1000–01. Gereau's letter to the Virginia Department of Education indicates that the source of disruption would come from the presumed lengthy hearing to determine what was actually said. Plf.Mem.Ex. A at 9 & 12. Gereau was even more concerned if the plaintiff's hearing resulted in her exoneration. This suggests a concern about backlash from the community and not a concern, as required under *Berger*, about the direct consequences of the speech itself.

The attention created by media coverage of the event does not change this analysis. First, it focuses overwhelmingly on the alleged use of the racial slur. One has to read the articles presently in the record very closely to even discover that the plaintiff was speaking about interracial dating. Thus, it was the racial slur, a fact Gereau says he did not rely upon and a fact that may not be considered at this juncture, that caused the furor that allegedly erupted after early March. Second, the school board defendants maintained in a press release in late March that there had been "no increase in discipline problems" at FCHS. Def.Ex. 19 at 3. A lack of discipline problems is a clear indicator of a lack of disruption.

Nor have the school board defendants shown that other *Rankin* factors exist here. For example, there is no showing that relations with co-workers were affected. *See Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). The school board defendants note that defendant Keen's reaction indicates the negative impact on co-workers. But defendant Keen had resigned well before the plaintiff's comments, apparently in part over unaddressed racial concerns. Moreover, there is no evidence that defendant Keen and plaintiff had to work together in order to effectively deliver education to Franklin County children. Keen was an English teacher. Plaintiff taught mathematics. The negative reaction of a few people to the speech is insufficient to overcome the plaintiff's interest. Indeed, it appears that the school board defendants

responded to a heckler's veto, just as the defendant in *Berger* did. 779 F.2d at 1001. The facts supporting other potential *Rankin* factors are similarly weak.

It appears, when viewing the evidence in the light most favorable to the plaintiff, the balance of interests here tips in favor of the plaintiff. Her strong First Amendment interest in speaking on social issues of concern to the community requires the employer to make a substantial showing of likely disruption, which it has failed to do. However, this being said, the balance of interests would tip in favor of the defendants if the plaintiff actually did use the racial slur or if, after a reasonable investigation, the defendants reasonably believed she used a racial slur. The threat of disruption from the speech itself is significantly higher, as the media coverage in this case indicates. It is in this sense that the use or nonuse of the term "nigger" is a material fact, precluding summary judgment for the defendant.

#### 4. Pretext

A clear question of fact exists here. The question is simply whether the school board defendants terminated plaintiff on the basis of the perceived disruption or whether they terminated her in retaliation for the speech. *Waters*, —— U.S. at ——, 114 S.Ct. at 1891; *Jeffries*, 52 F.3d at 13. In this case, Gereau's letter to the Virginia Department of Education provides all the evidence plaintiff needs on the pretext issue. As noted above, it expresses concern about disruption from failing to find that plaintiff said the things the students alleged were said. Moreover, there is evidence in the record to suggest that plaintiff's contract was not renewed in an effort to sweep the event under the rug. Gereau's letter speaks in terms of "localizing" the event to the few administrators, teachers, and students that knew of it. The speed with which Gereau decided to recommend nonrenewal is also indicative of an effort to avoid publicity and punish plaintiff for protected speech, rather than to prevent disruption. True, the school board defendants have strong evidence suggesting that it was the disruption that caused plaintiff's suspension. *See* Def.Ex. 9. But the record must be viewed in the light most favorable to

the plaintiff. Viewed in this light, a material issue of fact exists as to the true motive behind the school board defendants' actions.

## IV. Qualified Immunity

### A. Standard

Government officials exercising discretionary functions are entitled to qualified immunity if the officer's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In a qualified immunity inquiry, the court must engage in a three-step process. First, the court must identify the specific right allegedly violated. Second, the court must determine if the right was clearly established at the time the defendants acted. Third, if the right was clearly established, then the court must determine whether a reasonable person in the official's position would have known that his actions violated that right. *Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992). Government officials are not liable for bad guesses in gray areas. *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993).

### B. Application

Plaintiff claims a violation of her right to be free from retaliatory employment action based upon protected speech. There are two components of this right: the retaliation component and the First Amendment component. Both must be clearly established for the right as a whole to be clearly established. *See Tindal v. Montgomery County Comm'n,* 32 F.3d 1535, 1539 (11th Cir.1994). The right to be free from retaliatory employment action of the nature involved here—effective termination from one's job—is clearly established. *See Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Holland v. Rimmer,* 25 F.3d 1251, 1254 (4th Cir.1994); *Huang v. Board of Governors of Univ. of N.C.,* 902 F.2d 1134, 1140 (4th Cir.1990). Thus, the qualified immunity analysis rests upon the clearly established nature of the First Amendment right.

Defendants Gereau and Gibson must have qualified immunity from the results of finding an inadequate investigation. It was not until the *Waters* decision in 1994 that the First Amendment was clearly interpreted to provide such rights to public employees. The actions involved here occurred in 1993. Accordingly, should the jury decide that Gibson and Gereau did not adequately investigate the incident in light of the anticipated punishment, then Gibson and Gereau will not be held individually liable for damages that may, or may not, flow from this decision. *See supra* note 8.

The decision is more difficult on other components of the inquiry, for they are based not on new principles from *Waters,* but are instead rooted in time-honored legal principles in cases like this one. For Gibson and Gereau to be entitled to qualified immunity, it must not have been clearly established at the time of their actions that plaintiff's speech was on a matter of public concern. *Givhan* clearly established in 1979 that comments on race discrimination are matters of public concern. *Berger* followed in 1985 and established that a public employee working as an entertainer during his off-duty hours and performing in black face make-up was engaged in speech on a topic of public concern. However, the speech at issue here is not on the topic of discrimination, it is merely related to race issues. Furthermore, this case does not involve an employee working during off-duty hours. *See DiMeglio v. Haines,* 45 F.3d 790, 805 (4th Cir.1995) ("[I]t was, and is, not clear that when an individual presents himself as speaking in his capacity as a public employee, that his speech is protected.").

Other facts admittedly do point towards a conclusion that the speech was not on a matter of public concern. For example, the plaintiff's repeated emphasis that she offered her personal opinion could be interpreted as recognizing that her motive was to advance personal interests, not matters of public concern. This case is a fine example of the "subtle judgment" needed to apply the "public concern" portion of *Connick. Berger,* 779 F.2d at 999. I conclude, therefore, that a legitimate question exists about whether Gib-

son's and Gereau's conduct vis-à-vis plaintiff violated her First Amendment right. Accordingly, qualified immunity is appropriate. *See Korb v. Lehman,* 919 F.2d 243, 247 (4th Cir.1990), *cert. denied,* 502 U.S. 808, 112 S.Ct. 51, 116 L.Ed.2d 28 (1991).

This conclusion is buttressed when the balancing test is considered. As the Fourth Circuit has recently noted: "[O]nly infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, difficult to apply, and not yet well-defined." *DiMeglio,* 45 F.3d at 806. Even if the speech at issue here was a matter of public concern, it was not clearly established that the interest of the plaintiff outweighed the interest of the school board defendants. The inability to predict the outcome of this balancing also entitles Gibson and Gereau to qualified immunity.

### V. Conclusion

Once beyond the due process claim, a claim on which summary judgment is clearly appropriate, this case becomes more complex than meets the eye. The Supreme Court's decision in *Waters* raises the complexity. Proper application of that precedent leads to the conclusion that important questions of material fact remain. Accordingly, the case must be submitted to a jury. *Cf. Jeffries,* 52 F.3d at 11. Defendants Gibson and Gereau in their individual capacities will be dismissed.[13]

An appropriate order will be entered.

### ORDER

For the reasons stated in the memorandum opinion issued contemporaneously herewith, it is hereby ADJUDGED and ORDERED that the motion for summary judgment by defendants William Gibson, Leonard Gereau and the School Board of Franklin County be GRANTED in part and DENIED in part. Specifically, plaintiff's due process claim is hereby DISMISSED. Defendants

Gibson and Gereau are DISMISSED in their individual capacities only.

The Court having been informed at oral argument that the plaintiff no longer maintains claims against defendants Kelly Steele and Elizabeth Abshire, they are hereby DISMISSED with prejudice.

---

**13.** The only remedy against the school board defendants, then, appears to be injunctive relief, assuming that the Eleventh Amendment would shelter the school board defendants from a dam-

ages award. That issue, however, is insufficiently developed in the record at this point and, therefore, I do not decide it.