**Michele HANSEN, Plaintiff,**

v.

**DEAN WITTER REYNOLDS INC., Defendant.**

**No. 92 Civ. 7946 (HB).**

United States District Court, S.D. New York.

June 5, 1995.

Robert M. Simels, Debbie Strongin, Robert M. Simels, P.C., New York City, for plaintiff.

J. Michael Riordan, Bressler, Amery & Ross, New York City, for defendant.

### OPINION

BAER,[1] District Judge.

Plaintiff Michele Hansen ("Hansen") brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), and the New York Human Rights Law, N.Y.Exec.Law § 296 (McKinney 1993), claiming sex and pregnancy discrimination by her former employer defendant Dean Witter Reynolds Inc. ("Dean Witter") in the termination of her employment as Dean Witter's Assistant Vice President/In-

termediate Mortgage–Backed "Repo" Trader.

The bench trial took place on January 27, 30, and 31, and February 23, 1995. I find that plaintiff has failed to establish that (1) Dean Witter terminated her on the basis of her sex and/or her pregnancy, or that (2) Dean Witter's reasons for terminating her employment were pretextual. Plaintiff's complaint must therefore be dismissed.

### I. BACKGROUND

Plaintiff Hansen was hired by Dean Witter in January 1982 as a Bank Reconciliations Clerk, a clerical position. Plaintiff received several promotions during the course of her employment with Dean Witter. In 1985, plaintiff worked on the Fixed Income Division "Repo" Trading Desk, where she performed "repo trades," which consist of loans secured by the transfer of securities, which securities are repurchased when the debtor pays back the loan. In the fall of 1988, plaintiff worked on the Transactional Finance Unit repo trading desk ("TFU desk"). Plaintiff, along with Melvyn Relova and Michael Conry, occupied the TFU desk. Plaintiff was an Intermediate Mortgage–Backed Repo Trader on the desk when Dean Witter terminated her employment on September 14, 1989.

### II. THE LAW

#### A. RELEVANT STATUTES

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), provides that it is unlawful for "an employer to fail or refuse to hire or to discharge any individual … with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." In 1978, pregnancy discrimination was also expressly prohibited as constituting impermissible discrimination on the basis of sex. 42 U.S.C. § 2000e(k). The New York State equivalent of the federal Title VII protections are found in the New

---

**1.** Carole Gottesman, a second-year student at New York Law School, assisted in the research and preparation of this opinion.

York Human Rights Law, N.Y.Exec.Law § 296.

## B. BURDEN OF PROOF FOR SEX AND PREGNANCY DISCRIMINATION CLAIMS

■ One manner of establishing a prima facie case of sex discrimination under Title VII involves plaintiff showing that she was treated less favorably than comparable male employees in circumstances from which a gender-based motive could be inferred. *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 106 (2d Cir.1989); *Zahorik v. Cornell Univ.,* 729 F.2d 85, 93–94 (2d Cir. 1984). Plaintiff must prove her prima facie case by a preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993).

■ Once plaintiff has established her prima facie case, the burden shifts to the defendant to show that unlawful discrimination did not cause the subject employment action. If the employer has articulated a legitimate reason for the challenged employment decision, plaintiff must establish that the proffered reason is a pretext for discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). The ultimate burden of persuasion, as always, rests with the plaintiff to persuade the factfinder that the defendant intentionally discriminated against her. This may be accomplished "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Finally, the burden of proof is the same for both the federal and state actions. *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

## III. APPLICATION TO THE INSTANT ACTION

At trial, plaintiff's claim that her discharge from Dean Witter resulted from sex and pregnancy discrimination relied heavily on Dean Witter's decision to retain Relova, a man, on its TFU desk. Relova was the sole trader left at the TFU desk at the time of plaintiff's discharge. Plaintiff attempted in her case-in-chief to show that Relova was less qualified than she, and therefore, that her termination from Dean Witter must have been discriminatory. For the reasons stated below, I find plaintiff's argument unpersuasive.

■ At the outset, I find that Hansen has not put forth sufficient evidence of pregnancy discrimination. Plaintiff proffered as evidence of her pregnancy discrimination claim isolated statements made by Ian Bernstein, a Dean Witter manager, about how difficult it was to raise children in New York. Trial Tr. 735 (Bernstein). I find credible Bernstein's assertion that these comments were conversational in nature. His testimony included the fact that he himself had twins. *Id.* I can find nothing in Bernstein's testimony to suggest that his comments evidenced a discriminatory attitude toward pregnant women in that workplace. This is made especially clear by juxtaposing Bernstein's comments with Dean Witter's consistent policy that permitted pregnant employees to retain their position at Dean Witter following their pregnancies, including plaintiff herself following her 1987 pregnancy.[2] While Dean Witter's treatment of other pregnant women, as well as Hansen in 1987, cannot preclude a finding of discrimination in the instant case, it does appear inconsistent with plaintiff's claim and therefore militates against that finding. I turn now to Hansen's sex discrimination claim.

Returning to Relova, plaintiff pointed to several facts that she believed indicated he was less qualified than she was. These included Relova's higher absentee rate, his lack of experience in government-backed repo trading, and the fact that, during the rele-

---

2. Under the Family and Medical Leave Act, Dean Witter is currently required to permit women who give birth to take off twelve unpaid weeks without sacrificing their jobs. 29 U.S.C. § 2612(a)(1)(A). At the times in question here, that law was not in effect.

vant period, his salary had decreased. Plaintiff also attempted to show that she performed most of the trades at the TFU desk. As indicated below, credible trial testimony rebutted these assertions; indeed, as to the matter of who performed the most trades on the TFU desk, testimony indicated that the *quality* of the trades could very well have been just as, if not more, important than the *quantity* of those trades.

The fact that plaintiff traded in government-backed repos as well as mortgage-backed repos was shown not to be material in assessing who was the best qualified to staff the TFU desk. Robert Dwyer, head of the fixed income desk at Dean Witter (which included both types of securities) from April 1988 to June 1990, testified that when that desk and the TFU desk were to be consolidated during a restructuring, knowledge of both mortgage-backed and government-backed repos was not important in the staffing decision. Trial Tr. 440 (Dwyer). Because it was the mortgage-backed repo book that was being moved to the TFU desk, it makes sense that in assessing substantive knowledge the focus would be on mortgage-backed repos. It was not disputed that Relova had more experience in mortgage-backed trading. Trial Tr. 325 (Relova). Dwyer further testified that he relied on Ian Bernstein's assessment of who was best qualified to staff the TFU desk. Trial Tr. 448 (Dwyer). According to Dwyer, Bernstein was qualified to make the assessment because he had worked with Relova, Conry, and plaintiff, and the person he chose would work directly for Bernstein. *Id.*

Bernstein testified that Relova was the best qualified to staff the TFU desk. Trial Tr. 700 (Bernstein). He based that assessment on "having worked with those individuals for several years in the capital markets area, as well as having supervised them for a period of time." *Id.* Bernstein testified that his assessment was also based on reviews from the sales force that "were generally much more favorable towards Melvyn's ... abilities to get along with people and get the job done." *Id.* at 702. Plaintiff did not produce evidence to refute this characterization.

Plaintiff's claim that Relova routinely arrived later for work at the desk than she did was not substantiated. To the contrary, there was testimony that all three of the traders (Hansen, Relova and Conry) routinely took turns arriving late at work in a "round-robin" fashion. Trial Tr. 747 (Bernstein).

Plaintiff's claim that she did most of the trading at the TFU desk was similarly refuted. William Obermayer, employed at Dean Witter since 1986, interacted with the mortgage-backed repo traders virtually daily during the relevant period. Trial Tr. 663 (Obermayer). It was Dean Witter staff—not outside customers—with whom these traders worked. Obermayer testified that, when working with the TFU desk, he dealt with Relova "85 to 90 percent of the time," *id.* at 665, and that it was *not* his recollection that Hansen did most of the trades during that period, *id.* at 666, 668. Obermayer further testified that Relova was able to negotiate a better rate for his clients. *Id.* at 670 (stating that Relova "generally would negotiate better with my clients ... [and] I would get more business done with him"). When asked about plaintiff's demeanor in comparison to Relova's, Obermayer stated that "she was much more difficult to work with." *Id.* This characterization of who worked better with the Dean Witter staff is consistent with Bernstein's testimony that Relova worked better with the staff than Hansen did.

 In view of these findings, I conclude that plaintiff has not met her burden of proving that sex and/or pregnancy discrimination caused her termination. The record contains ample testimony supporting Dean Witter's position that Relova was better qualified for the position than Hansen. Indeed, the law provides that, in discrimination actions, the court is not to second-guess the defendant's judgment; the factfinder should not assess "whether the employer's decision was erroneous or even rational, so long as the employer's actions were not taken for a discriminatory reason." *Gilman v. Runyon*, 865 F.Supp. 188, 193 (S.D.N.Y.1994); *see also Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir.1988). The Court, in accordance with the law, declines an invitation

to further investigate the merits of the staffing decisions at Dean Witter.

## IV. *PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM*

■ Plaintiff attempted to add a "hostile work environment" claim to the instant action. The Court denied this request before trial because plaintiff had not obtained a right-to-sue letter from the Equal Employment Opportunity Commission on this issue, having never included such a claim in her EEOC complaint. Consequently, plaintiff had not exhausted administrative remedies, and was accordingly precluded from pursuing the claim here.

The Court, however, heard testimony on the issue as part of plaintiff's case-in-chief because the law permits such testimony as evidence of a discriminatory atmosphere on the part of defendant that could be used to support plaintiff's case for a pretextual employment decision. *See Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1210 (2d Cir.1993); *see also Conway v. Electro Switch Corp.,* 825 F.2d 593, 597 (1st Cir.1987) (stating that evidence of a discriminatory atmosphere is "relevant to the question of motive in considering a discrimination claim [because] [w]hile [such evidence] may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff"). Thus, just as I permitted defendant to introduce evidence concerning its treatment of pregnant women generally, I permitted plaintiff to introduce evidence that she believed manifested Dean Witter's hostile and discriminatory atmosphere towards women generally. I would have been more concerned with unfair prejudice had this been a jury trial, and might actually have ruled differently.

■ Plaintiff focused primarily on three incidents in her effort to show that defendant maintained a hostile work environment. Two of them involved sexually explicit birthday cakes, while the other concerned what a female employee, Lynn Jerome, described as an "act of terrorism" perpetrated against her by a male Dean Witter manager. As explained below, I find that the birthday cake incidents are not attributable to defendant Dean Witter; the incident that Jerome called an act of "terrori[sm]," meanwhile, is at best an exaggeration and at worst calls into question Jerome's judgment generally.

One of the birthday cakes in question was presented to plaintiff in 1986 by several co-workers. The cake was in the shape and color of a black man's penis, was filled with Devil Dog® cream, and bore the dubious greeting, "Happy Birthday, Bitch." Trial Tr. 39 (Hansen). Hansen did not file a complaint or otherwise report this incident to management. *Id.* at 40. In fact, there was testimony by a former co-worker that Hansen was so proud to receive the cake that she stored the remaining portion in her freezer and brought it to her parents' home for their July 4th barbecue. Trial Tr. 486 (Cartier).

While food for thought, it is unnecessary to decide whether Hansen considered the cake an insult or a joke. There was evidence that she partook enthusiastically in the event, and there was testimony that she was proud of being referred to as "the bitch" and that the name was in fact a self-professed title as she considered herself "a tough cookie." The fact is that she failed to inform any supervisory personnel, and thus there is nothing on which to base a determination that Dean Witter tolerated, prohibited, or encouraged such activity. There was, however, a similar situation that was reported to management; Dean Witter's reaction left no doubt as to its stance towards such cakes. In 1982, Ms. Jerome received a cake from co-workers "in the shape of a man's anatomy." Trial Tr. at 260 (Jerome). Upon being made aware of the nature of the cake, Dean Witter's Chairman issued a memorandum stating that such behavior would not be tolerated and that any persons involved in such activity would be terminated. *Id.* In light of this response, there is hardly support that the birthday cake incident is indicative of a sanctioned hostile work environment for women at Dean Witter.

■ The same is true of the event that Jerome referred to at trial as an act of terrorism. Jerome stated during her initial

testimony that she had complained about "sexual matters" in 1989 based on her being "called in and terrorized" at Dean Witter. Trial Tr. at 270–71 (Plaintiff's Question, Jerome). When asked to provide greater detail, Jerome offered, "It's very strong male intimidation to the point of, without touching a person, there is a physical reaction by the strength of the words." Trial Tr. at 271 (Jerome). In an abundance of caution, the Court later granted a requested continuance in order to permit proper discovery concerning a different incident that Jerome related she had only recently been able to remember. It was when Jerome returned to testify that the actual nature of the alleged "act of terrorism" was elicited by Dean Witter. Admittedly, I was anticipating something much more dramatic.

When asked to what she was referring regarding the 1989 complaint, Jerome testified to only one event, an incident where she and a male colleague were called into a conference room by Ray Anderson, a Dean Witter manager. Jerome and her colleague had been reading newspapers on the trading floor. According to Jerome, Anderson "rose himself up in an intimidating male stature and proceeded to scream, 'You're fired.'" Trial Tr. 882 (Jerome). While Dean Witter did not attempt to draw forth an elaboration of what, if anything, this "intimidating male stature" consisted of, Jerome conceded that Anderson never got within three and one-half feet of her, nor did he make any sexist or off-color remarks. *Id.* Finally, as Jerome acknowledged, no adverse personnel action resulted, notwithstanding Anderson's statement that if Jerome and her colleague "had nothing better to do than read the paper, he wanted [their] resignations." Trial Tr. at 885 (Defendant's Question, Jerome). Jerome then pointed out that Anderson had made this statement "in an extremely loud tone of voice." *Id.* at 885 (Jerome). It is beyond peradventure that one would be hard pressed to consider this an act of terrorism. Fortunately, Hansen did not press the point.

## V. *TRADING TICKETS ISSUE*

■ Plaintiff moved during trial for sanctions pursuant to Rule 37(b) of the Federal Rules of Civil Procedure based on Dean Witter's destruction of the trading tickets processed by the TFU desk during the time period that Hansen worked on the desk. Plaintiff claimed at trial that she performed substantially all of the trades at the TFU desk, and pointed out that the trading tickets would be necessary to support her claim, because while all individuals at the desk traded under the same number, the tickets could be used to identify who completed each trade based on the handwriting appearing on each. Dean Witter's failure to retain the tickets, plaintiff argues, constitutes the spoliation of evidence and warrants sanctions. The Court has considered plaintiff's motion, and for the reasons stated below, the motion is DENIED.

The trading tickets at issue were destroyed by Dean Witter pursuant to its internal document retention policy, which provides for a three-year retention period. Although applicable SEC regulations permit the destruction of these documents after a period of three years, the fact that Dean Witter's policy, and observance of that policy, complied with the SEC requirement does not render Dean Witter immune from charges that it despoiled evidence. The same is true concerning Dean Witter's compliance with the EEOC requirement that employers retain certain employee personnel information upon receipt of an EEOC charge filed by the employee.[3] Instead, I must ascertain whether Dean Witter had an independent duty to preserve the trading tickets for the benefit of Hansen in this litigation. *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72–73 (S.D.N.Y.1991). Such a finding, I conclude, requires Dean Witter to have been on notice that the tickets would be relevant to the Hansen litigation.

■ Many Rule 37(b) cases involve the alleged spoliation of evidence that had been demanded in discovery. Whether or not a party had notice of the evidence's relevance is not at issue in those cases because once a discovery request has been made, the party possessing the evidence, by definition, has notice of its relevance. *Turner,* 142 F.R.D.

---

**3.** Applicable EEOC regulations require that employers retain personnel documents such as employment applications and supervisor evaluations, which Dean Witter did retain.

at 72–73; *see also Computer Assocs. Int'l v. American Fundware, Inc.*, 133 F.R.D. 166, 169 (D.Colo.1990). Aside from discovery requests, the complaint itself can put an adversary on notice of the duty to preserve evidence that is relevant to the action, as can the communication that litigation is merely anticipated. *Turner*, 142 F.R.D. at 73.

Although it is a close question, I find that neither the filing of the complaint nor the letters that the EEOC and the New York State Division of Human Rights sent to Dean Witter were such that Dean Witter knew or should have known that the trading tickets would be relevant to this litigation. This is true despite the fact that such documents should have, at the very least, put Dean Witter on notice that the relative performance of Hansen and Relova would be at issue in the litigation. As Dean Witter manager Mitchell Merin explained at trial, due to the nature of the mortgage-back repo trading market, although the trading tickets would indicate who wrote the *most* trading tickets, they would not reflect who effected the *best, most profitable* trades on the desk. Trial Tr. 907 (Merin). The absence of any evidence that Dean Witter relied on the trading tickets for the purpose of evaluating the performance of its employees supports that statement. Def.'s Letter Br. Opp'n Pl.'s Rule 37(b) Mot. at 2, n. 2 ("No witness testified to relying upon or even needing to rely upon the trading tickets to make the termination decision."). Indeed, it is interesting to note that plaintiff, who vigorously asserts that Dean Witter should have known of the tickets' relevance, did not specifically ask for them significantly earlier than her letter dated May 18, 1993.[4] Finally, as indicated above, there exists credible testimony from Bernstein and Obermayer that contradicts plaintiff's assertion that she was responsible for most of the trades.

---

**4.** Plaintiff asserts that her May 18, 1993 letter indicates that the parties had earlier discussions concerning the trading tickets at issue in that they were encompassed by her document request number 2, which read, "Copies of all documents signed by the plaintiff in the course of her employment with the defendant." Dean Witter, however, has provided a copy of its response to that request, which indicates that the parties apparently had agreed to narrow the request: "Pursuant to a telephone conversation between

### CONCLUSION

For the reasons stated above, I find that plaintiff has failed to satisfy her burden of proof that Dean Witter's decision to retain Melvyn Relova and terminate plaintiff was motivated by the plaintiff's sex and/or pregnancy. The complaint is dismissed.

**SO ORDERED.**

---

David A. Walsey of Robert M. Simels, P.C. and J. Michael Riordan of Bressler, Amery & Ross on February 11, 1993, this request was withdrawn except to request the documents in plaintiff's personnel file in the possession of Dean Witter...." Even if the request had not been narrowed, plaintiff has failed to provide evidence of having made the initial request within the three-year period during which the tickets would have been retained.