**Jeffrey Lee WILLIAMS, Plaintiff,**

v.

**T. Neal MORRIS, Beverly C. Elliott, A. Ray Griffin, and the City of Danville, Virginia, Defendants.**

**Civil Action No. 96–0008–D.**

United States District Court, W.D. Virginia, Danville Division.

Nov. 27, 1996.

---

William Cloud Hicklin, IV, Chatham, VA, for Jeffrey Lee Williams.

Yvonne Steenstra Wellford, John Sykes Barr, Christopher Abram Jones, Maloney, Barr & Huennekens, Richmond, VA, for T. Neal Morris, A. Ray Griffin, City of Danville, Virginia.

Yvonne Steenstra Wellford, John Sykes Barr, Maloney, Barr & Huennekens, Richmond, VA, for Beverly C. Elliott.

### MEMORANDUM OPINION

KISER, Chief Judge.

Plaintiff Jeffrey Lee Williams is a former police officer with the City of Danville in its Department of Public Safety ("the police department" or "DPD"). In Count I of the amended complaint, Williams alleges that defendants Morris, the chief of police, and Griffin, the city manager, violated Williams' free speech rights by terminating him in December, 1994, in retaliation for his speaking out on a matter of public concern. In Count II, Williams alleges that defendants Morris and Elliott, the assistant chief of police, fostered a racially hostile work environment in violation of federal law. The third and final count of the complaint has been dismissed. The defendants bring a joint motion for summary judgment asserting there is no dispute of material fact and they are entitled to judgment as a matter of law on Counts I and II. The defendants have also brought a motion for sanctions seeking payment of attorneys' fees and a prohibition on use of evidence at trial; the defendants claim Williams has failed to make timely discovery disclosures.

The parties have fully briefed the issues involved and have presented oral argument. The motions are, therefore, ripe for disposition. For the reasons contained herein, I am of the opinion that the defendants' motion for summary judgment should be GRANTED and the motion for sanctions should be GRANTED as to monetary sanctions in part.

## I. FACTS

The uncontradicted facts follow:

On December 10, 1994, Williams was on duty with Detective Thomas Breedlove when he received a message to call Pam Carter. Carter was a distant relative of Williams and an occasional informant. Williams called Carter, who related to Williams a series of complaints about, as Williams alleges, unlawful and unconstitutional actions taken against her and her family by members of the DPD, including her warrantless arrest, improper comments about "niggers," surveillance of their home, and sexual harassment of her by the officers conducting surveillance. Williams expressed shock and also spoke to Pam Carter's husband, Corey, regarding some of these allegations. During this conversation, Williams confirmed Pam Carter's identification of detective Dean Hairston as one of the police officers working the surveillance. See Tr. of Grievance Hearing at 217 (testimony of Williams) ("Q. Did you confirm a name to any of those descriptions? A. Dean Hairston.").

Detective Breedlove overheard this phone conversation. Williams alleges that, after this conversation, Breedlove advised Williams that he was going to be in trouble for "talking to the enemy[,]" that "Capt. Smith was going to shit bricks when he finds out that I have been talking to Corey Carter[,]" Williams Letter at 3 (Dec. 17, 1994), and that Williams should keep quiet, because if he kept talking about the incident, he would get fired. See Williams Dep. at 181. Williams was "scared, [because he] didn't want to get fired[,]" so he did not report the complaint. Id.

On December 15, 1994, Williams claims that Captains Smith and Rigney confronted him about the conversation he had with Pam and Corey Carter and accused him of violating department policies. Williams restated what he and the Carters discussed. Williams contends that the captains tried to "persuade" him that he had been "suckered" in by Pam and Corey Carter and tried to make him "incriminate" himself. Williams states that Captain Smith confirmed he had disclosed no secret information because he "did not have it to give." Williams Letter at 5 (Dec. 17, 1994). Williams claims Smith told him, "That is what is wrong with you now, Williams, you believe her over us." Williams Dep. at 111.

On December 16, 1994, Morris gave Williams a Personnel Order, notifying Williams of his immediate suspension from the DPD and alleging that Williams violated Item·27 of the Rules of Conduct and a provision of the Law Enforcement Code of Ethics for releasing confidential information about the identity of an officer conducting surveillance. Williams claims that Morris told him Breedlove had previously admonished Williams of "the possibility of you getting a police officer injured or killed by putting out information like this;" Williams claims Breedlove never told this to him. Amended Compl. at ¶ 14. Morris recommended to Griffin, the city manager, that Williams' employment be terminated.

Defendant Griffin acted upon Morris' recommendation and terminated Williams by a December 28, 1994, letter. Williams appealed his termination to Griffin, and at the appeal hearing, Morris and Elliott, according to Williams, gave false testimony about the Carters' allegations. Griffin affirmed the termination. Williams appealed again to a grievance panel, which affirmed the termination decision; Williams claims this was as a result of Morris' and Elliott's perjury.

On February 1, 1996, Williams filed the initial complaint in this action, consisting of federal claims under the First and Fourteenth Amendments and 42 U.S.C. §§ 1983 and 2000 and pendent state claims. An amended complaint was filed on June 17, 1996. The following claims remain:

● *Count I:* Defendants Morris and Griffin violated Williams' free speech rights under the First Amendment, as extended to the states by the Fourteenth Amendment, by terminating him in retaliation for his speaking out or attempting to speak out on a matter of public concern. Williams claims Morris terminated him because he was a potential whistleblower regarding unlawful acts by officers directed at the Carters. Williams alleges that Morris' justifications in the Personnel Order were a pretext; Morris in fact terminated Williams for violating an unwritten "Code of Silence" under which Morris expected officers to ignore wrongdoing and brutality of other officers. These actions also make "Morris as an individual and in his official capacity, Griffin in his official capacity, and the City of Danville ... subject to injunctive remedies, and liable to Williams for damages consequent to his wrongful termination, under 42 U.S.C. § 1983." Amended Compl. at ¶ 21.

● *Count II:* Williams, a black male, alleges that Morris and Elliott fostered a racially hostile work environment in which racial slurs and epithets were used regularly, in which black citizens are treated with "disdain, contempt, and brutality[,]" in which only "token" blacks are employed as "quota niggers[,]" in which no promotions to supervisory positions were available to blacks, and in which blacks were "routinely" assigned the most dangerous beats. *Id.* at ¶¶ 24–30. As a result of this environment, Williams suffered "stress, depression, and decreased job motivation and efficiency." *Id.* at ¶ 31. "Therefore, Morris and Elliott, as individuals and in their official capacities, and the City of Danville, are subject to injunctive remedies, and liable to Williams for damages consequent to his suffering ... under 42 U.S.C. §§ 1983 and 2000(e)." *Id.*

Under Rule 26 of the Federal Rules of Civil Procedure and the pretrial order in this action (filed on April 23, 1996), Williams was required to make initial disclosures by May 1, 1996. Williams failed to do so, prompting

the defendants to file a motion to compel disclosure on July 2, 1996. In mid-July, Williams produced a list of witnesses which, in many cases, omitted addresses, telephone numbers, and the subject of discoverable information. On July 25, 1996, the Court entered an order directing Williams to supplement his initial disclosures by August 14, 1996. Williams did not file supplemental disclosures by August 14, 1996. The defendants advised the Court of this violation, and the Court directed the parties to convene by telephone conference call on September 19, 1996. About an hour and a half before the hearing, Williams faxed supplemental information.

## II. ANALYSIS

### A. MOTION FOR SUMMARY JUDGMENT

#### 1. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citations omitted), *cert. denied,* 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

#### 2. Retaliatory Discharge (Count I)

■ The defendants contend that the speech Williams claims brought about his termination is not protected by the First Amendment. They claim the speech was not about a matter of public concern which, as the court in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), pointed out, is speech that "relat[es] to any matter of political, social, or other concern to the community[.]" *Id.* at 146, 103 S.Ct. at 1689. The defendants point out that Williams acknowledged in his deposition that the identity of officers conducting surveillance was official business and that Williams acknowledged he confirmed the identity of Detective Hairston to Pam Carter. *See* Williams Dep. at 82–83. The defendants claim this is in clear violation of Item 27 of the Rules of Conduct, thus Williams' termination was justified.

In rebuttal, Williams contends that the confirmation of the identity of someone who had already identified himself to Pam Carter and who had given his business card to Mrs. Carter was not the disclosure of sensitive information meriting Williams' termination. Williams points to Officer Smith's confirmation that he had disclosed no secret information because he did not have it to give. Williams points to Item 28 of the Rules of Conduct, which requires that members identify themselves when requested and before taking any police action. Williams claims the context of the conversation between him and Mrs. Carter and the context of other instances in which officers who do not "talk right" are harassed or disciplined demonstrates that the identification issue is a transparent pretext for his termination. Williams contends the real motive for his firing was that the defendants did not want someone who "believes" "the enemy" or would be "like Carroll Allen." In a short comment at his deposition, Williams alleges that he attempted to report the Carters' complaint, but he was sabotaged by Breedlove and Smith. *See* Williams Dep. at 112.[1]

In *Scruggs v. Keen,* 900 F.Supp. 821 (W.D.Va.1995), I noted that the "threshold inquiry in any speech-related employment case" is a determination of "whether the

---

1. By not responding to the defendants' requests for admissions, Williams has admitted for purposes of this motion that he "never" complained to a superior officer about the treatment of black citizens by the police department. *See, infra,* note 2 and accompanying text.

speech at issue is on a matter of public concern." *Id.* at 829 (citations omitted). This is "a matter of law for the court to decide" and the "burden is on the employee to show that [his] speech is constitutionally protected." *Id.* (citations omitted). In determining whether particular speech is on a matter of public concern, I made the following points:

> [T]he content of the speech is important. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. Speech whose content is designed to bring to the public's attention instances of official misconduct or breaches of public trust is more likely to be protected than speech on matters of personal interest. *Jurgensen v. Fairfax County,* 745 F.2d 868, 879 (4th Cir.1984). The context of the speech is also important. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. Speech in a public forum is more likely to be protected than speech in a private conversation. *Smith v. Fruin,* 28 F.3d 646, 652 (6th Cir.1994), *cert. denied,* 513 U.S. 1083, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995). However, this inquiry is not dispositive. Speech that occurs in a private conversation may indeed be protected speech. *Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979) (employee speaking in private to supervisor). *Cf* [*Waters v. Churchill,* 511 U.S. 661, 665, 114 S.Ct. 1878, 1883, 128 L.Ed.2d 686 (1994).] Speech of public concern may also be "fairly considered as relating to any matter of political, social or other concerns of the community." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690; *Feldman v. Philadelphia Hous. Auth.,* 43 F.3d 823, 829 (3d Cir.1994); [*Berger v. Battaglia,* 779 F.2d 992, 999] (focus is on whether public or community would be truly concerned with or interested in the particular expression). *But cf. Smith,* 28 F.3d at 651 (holding that just because speech is of general public interest does not make it a matter of public concern).

*Id.* at 830. I noted that, "[i]f the speech is not on a matter of public concern, the employee may be fired because of it. No further analysis is necessary." *Id.* at 829 (cit-

ing *Holland v. Rimmer,* 25 F.3d 1251, 1255 n. 10 (4th Cir.1994)).

Although the issue of the "real" motive behind Williams' termination is contested, the details of the conversation between Williams and the Carters are undisputed. As Williams' letter of December 17, 1994, states, Williams' conversation with the Carters took the following course:

> Pam Carter related the incidents of her "false arrest" and an improper comment about "niggers" made by an officer at the station to Williams. Williams told her the comment sounded like police harassment. Corey Carter then spoke with Williams. Corey Carter and Williams discussed Corey Carter's acquittal from a prior charge of robbery; Corey Carter indicated he was being followed by the police. Pam Carter came back on the phone. She told Williams she had conversed with officers who were conducting a surveillance of her home and that Detective Hairston, whom she recognized, and the other officer sexually harassed her. Williams confirmed Pam Carter's identification of detective Dean Hairston but was unable to identify the other officer. Pam Carter told Williams that an unknown officer apologized and admitted to mistakenly identifying her and her husband in connection with the robberies the police department was investigating.

*See id.* at 1–3. At Williams' grievance hearing, Pam Carter testified that her intent in phoning Williams was to find out if something could be done about the surveillance and the sexual harassment. *See* Tr. of Williams Grievance Hearing at 175. However, there is no evidence in the record that Williams gave any advice to Carter. Williams has also admitted that he never forwarded to his superiors complaints about the treatment of black citizens. *See, supra,* note 1.

I find that the speech in question is not on a matter of public concern. As the evidence demonstrates, the content of the speech was aimed at remedying the Carters' personal situation, it was not "designed to bring to the *public's* attention instances of official misconduct or breaches of public trust[,]" *Scruggs,*

900 F.Supp. at 830 (emphasis added), nor did it "relat[e] to any matter of political, social, or other concern to the community," *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689. This case stands in contrast to the situation in *Scruggs*, where the plaintiff was giving her opinion on interracial dating to several students.

Similarly, the context of the speech supports a finding of no public concern. Here, the speech took place in a private conversation between Williams and the Carters; the only alleged witness is Detective Breedlove.

Much of Williams' rebuttal concerns the wisdom or fairness of his termination. However, the *Connick* court pointed out that federal courts are not the appropriate forum to review the wisdom of a personnel decision where there is no deprivation of a fundamental speech right. *See id.* at 147, 103 S.Ct. at 1690.

Because Williams has not met his burden of proof to demonstrate that his speech was "constitutionally protected," *Jurgensen*, 745 F.2d at 878, his claim fails under both the First Amendment and Section 1983. *See* 42 U.S.C. § 1983 (requiring the deprivation of a right, privilege, or immunity secured by the Constitution and laws). Accordingly, the defendants' summary judgment motion as to Count I of the complaint is granted.

### 3. Hostile Work Environment (Count II)

■ Williams has made claims under both Section 1983, 42 U.S.C. § 1983, and Title VII, 42 U.S.C. § 2000e et seq., alleging that defendant Morris in his individual and official capacities, defendant Elliott in his individual and official capacities, and the City of Danville are liable to him for damages suffered by reason of a racially hostile environment at the DPD. Although the same facts can constitute a violation of both statutes, *see McWilliams v. Fairfax County Bd. of Supervisors*, 72 F.3d 1191, 1196 (4th Cir.1996) ("such parallel constitutional claims may lie in appropriate situations where, as here, the employer is a state-actor"), *cert. denied*, — U.S. ——, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996), the proof requirements as to certain elements are different. To proceed under Title VII, the claimant is first required to present his claim to the U.S. Equal Employ-

ment Opportunity Commission ("EEOC"). *See Riley v. Technical and Management Services Corporation, Inc.*, 872 F.Supp. 1454, 1458–60 (D.Md.1995) (granting the employer's summary judgment motion, because the court did not have jurisdiction over a hostile environment claim that was not presented to the EEOC), *aff'd*, 79 F.3d 1141 (4th Cir. 1996); *Hansen v. Dean Witter Reynolds Inc.*, 887 F.Supp. 669 (S.D.N.Y.1995) (plaintiff barred from adding hostile environment claim because plaintiff had not obtained right-to-sue letter from EEOC on the issue). No such requirement is attendant to a Section 1983 claim. In a Section 1983 claim, however, the plaintiff is restricted to claims in which the defendant has personal involvement. In this case, it is clear that Williams did not present his hostile environment claim to the EEOC. *See* Defs.' Mem.Supp. Summ.J. at Ex. A (copy of Charge of Discrimination filed with the EEOC by Williams). Consequently, Williams cannot pursue a recovery under Title VII.

■ Although Williams cites 42 U.S.C. § 1983 as an alternative statutory basis for his hostile work environment claim, he fails to pursue it in his brief and argument. Specifically, he produces no evidence or argument on how the City can be held liable under existing Section 1983 jurisprudence. It is black letter law that the doctrine of *respondeat superior* does not apply in Section 1983 cases. *See Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir.1977). For the City to be liable, Williams must prove that the alleged hostile environment was because of city policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986). The record is devoid of evidence and argument as to any city policy which created the hostile work environment. Similarly, a suit against Morris and Elliott in their official policies is tantamount to suing the city. *See Monell*, 436 U.S. at 690–94, 98 S.Ct. at 2035–38; *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Thus, the only question remaining is whether there is sufficient evidence to raise an issue

of material fact so as to enable the case to proceed against defendants Morris and Elliott under Section 1983 in their individual capacities.

### i. *Sufficiency of the evidence*

The defendants contend that Williams has failed to articulate any factual support for his claim of a racially hostile work environment. To prove a racially hostile work environment, the defendants maintain, Williams must show that the "workplace [was] permeated with discriminatory intimidation, ridicule, and insult ... that [was] sufficiently severe or pervasive to alter the conditions of [Williams'] employment and create an abusive working environment...." *Harris v. Forklift Systems,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). However, the defendants claim, Williams admits that defendants Morris and Elliott never directed racial slurs or epithets toward him.[2] Additionally, before his termination, Williams admits that he never complained to any of his superior officers, to the city manager, or to members of the city council about the use of racial slurs and epithets within the police department or about the treatment of black citizens by members of the DPD. Morris has signed an affidavit stating that any officer eligible for promotion must undergo an objective test that is administered outside the DPD. Several African–Americans employed by the DPD have provided affidavits indicating no racially hostile work environment exists. Two police department employees have signed affidavits indicating that the most stressful and dangerous beats are routinely rotated. Breedlove's affidavit indicates there is no differential treatment of African–Americans at the department. Consequently, the defendants argue, this claim should also fail because the employer had no actual or constructive knowledge of the hostile environment, as required by *Katz v. Dole,* 709 F.2d

251, 255 (4th Cir.1983), and *Dennis v. County of Fairfax,* 55 F.3d 151, 155 (4th Cir.1995).

In response, Williams alleges the defendants misinterpret *Forklift* to require a workplace "permeated with discriminatory intimidation, ridicule, and insult." *Id.* Williams contends the appropriate standard is that of *Rogers v. EEOC,* 454 F.2d 234 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), which prohibits "a working environment heavily charged with discrimination." *Id.* at 238. Williams claims that in *Rogers,* the plaintiff prevailed on the theory that the employer's discriminatory treatment of clients created a hostile working environment.

In support of his hostile environment allegation, Williams points to the following evidence:

- *Discriminatory beat assignments.* Twelve of the 13 black officers were on high-crime beats, *see* Williams Aff. at ¶¶ 3–4, and Williams was on the same high-crime beat for his entire 4¾–year tenure at the DPD, although he asked Captain Rigney for a transfer several times. *See* Williams Dep. at 195, 202. Whites were only placed on the high-crime beats when they made the supervisors mad. *See id.* at 197. Morris told Carroll Allen, a former DPD officer, "[Y]ou have to have niggers to police niggers; you can't put a white officer in the projects and expect him to keep order. You need someone like M.T. White to bust some heads—then they can't holler discrimination." Allen Aff. at ¶ 10.

- *Discriminatory promotions.* Williams was upset that other officers who would "lie or cover up" to protect the city or DPD were promoted. *See id.* at 146. Williams claims that black officer Dean Hairston was promoted to lieutenant the

---

2. The defendants note that Williams has not responded to the requests for admission they propounded on August 9, 1996; thus, the defendants contend, these requests are deemed admitted. Ample case law supports this proposition. *See* Fed.R.Civ.P. 36(a) ("The matter is admitted unless, within 30 days after service of the request, ... the party to whom the request is directed serves ... a written answer."); *see also, e.g., An-*

*Port, Inc. v. MBR Industries, Inc.,* 772 F.Supp. 1301 (D.Puerto Rico 1991) (Plaintiff's failure to respond to defendant's request for admissions within period given resulted in automatic admission of requests contained therein, conclusively establishing admitted facts as law of case, which could be utilized by defendant to support motion for summary judgment).

day after Williams' panel hearing as a reward for his testimony against Williams. *See id.* Williams claims that Officer Brown was promoted without taking a promotion examination. *See id.* at 148. Williams heard rumors that Chief Morris cleared white Officer Heffinger's record of all disciplinary actions and manipulated the testing procedure to promote Heffinger. *See id.* at 159. Allen overheard a conversation in which Morris ordered an employee to destroy the records of an incident of brutality by Officer Heffinger. *See* Allen Aff. at ¶ 8. Williams assumed he would not be promoted because he was black, *see id.* at 193–94, and saw other qualified blacks who were continuously turned down for promotion. *See id.* at 194.

● *Actions showing hostility to blacks.* Williams was upset when he was pressured by Dispatcher Basden to sign a confederate flag petition while he was on duty. *See id.* at 187–88. Williams was bothered by the fact that Basden wore a hat with an "X" on it, because Williams felt Basden was mocking blacks who wore similar hats. *See id.*

● *Improper pressure.* Williams was pressured to write a lot of tickets when the officers knew his beat did not generate traffic offenses. *See id.* at 195.

● *Racial comments.* Williams claims other policemen made "racial comments." *See id.* at 216. Williams heard rumors, which he later confirmed with white officer Creed, that Elliott told Creed in Morris' presence he was tired of hiring "quota niggers" and the men just "laughed." *Id.* at 189–90. Williams claims he heard rumors that Elliott told a group of white officers to not "take . . . shit off those niggers[.]" *Id.* at 190. Elliott once told Allen, "Neal says we have all the niggers we are required, and we sure don't want any more than we have to." Allen Aff. at ¶ 10. Williams was upset by Pam Carter's al-

legations of police use of racial epithets. *See id.* at 62.

● *Firing of blacks for frivolous reasons.* Williams alleges that blacks would be fired "for frivolous reasons," *id.* at 216; for example, Williams' predecessor was a black male who was "fired for nothing." *Id.* at 193.

● *Harassment of him.* After Williams' panel hearing, Williams and his family were shaken when an unmarked DPD police car was parked outside his home in the county. *See id.* at 170. Williams claims that, when he was fired, his badge and service weapon were taken from him in front of his family as an example to other officers who might seek to disclose police irregularities. *See id.* at 125.

● *Pressure to keep silent about improprieties in the DPD.* Lieutenant Willis told the officers, including Williams, during a roll call that Officer Godsey "was not talking right" about an allegedly unjustified shooting of Mr. Hodnett by Officer Eanes, which Godsey witnessed. *Id.* at 252. Williams submits an affidavit by Floyd Poindexter, a former officer of the DPD. Poindexter discusses his harassment by Morris and the supervisors after he sought to get an opinion from the state attorney general's office on one of Morris' actions. Carroll Allen, a former officer with the DPD, provides an affidavit detailing various harassing actions against him in retaliation for his exposure of illegal actions.[3] Allen states that Morris once threatened him and others that, if they did not straighten up, they would be "working niggertown." Allen Aff. at ¶ 9.

Williams assumed the supervisors could not miss what was going on, because it was in the hallway, but he did not know whether they knew. *See id.* at 216. Williams claims that the employer had knowledge of the discrimination, because much of the discrimina-

---

**3.** Carroll Allen was a Danville officer whose disclosure of illegal actions by Morris and others resulted in Morris' suspension for 22 months. When Morris was reinstated, Allen claims Morris "commenced a campaign of harassment against" him which ultimately led him to resign. Allen Aff. at 1–3.

tion occurred because of the deliberate acts and practices of Morris and Elliott.

■ As the Supreme Court held in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), an employer can be liable for "requiring people to work in a discriminatorily hostile or abusive environment." *Forklift,* 510 U.S. at 21, 114 S.Ct. at 370.[4] To survive a motion for summary judgment, "First, the plaintiff must make a *prima facie* showing that [the] harassing actions took place," *Katz v. Dole,* 709 F.2d 251, 256 (4th Cir.1983). The requirements for this *"prima facie* showing" are as follows:

> The plaintiff must show (1) that the conduct in question was unwelcome, (2) that the harassment was based on [race], (3) that the harassment was sufficiently pervasive or severe to create an abusive working environment, and (4) that some basis exists for imputing liability to the employer.

*Brumback v. Callas Contractors, Inc.,* 913 F.Supp. 929 (D.Md.1995) *(quoting Paroline v. Unisys Corp.,* 879 F.2d 100 (4th Cir.1989)). To determine the third element of this showing, the Supreme Court in *Forklift* clarified that an employer is liable for conduct that is "severe or pervasive enough to create an objectively hostile or abusive working environment—an environment that a reasonable person would find hostile or abusive." *Id.* In deciding whether an environment is "hostile" or "abusive," courts must look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. at 371. Courts may consider the effect of the discriminatory conduct on the employee's psychological well-being as a factor. *See id.* As the court in *Schweitzer–Reschke v. Avnet, Inc.,* 874 F.Supp. 1187 (D.Kan.1995), noted courts may also consider whether the conduct is that of a supervisor or fellow employee.

■ Once the plaintiff meets this initial burden, "the employer may still be successful on summary judgment if it is able to prove that 'either ... the events did not take place, ... They were isolated or genuinely trivial[,] ... [the employer took prompt] remedial action reasonably calculated to end the harassment,' or the employer was unaware of the harassment." *Brumback,* 913 F.Supp. at 939 (D.Md.1995) *(quoting Katz,* 709 F.2d at 256).

Although the Fifth Circuit's decision in *Rogers v. EEOC,* which is cited by Williams, predates *Forklift* by over 20 years, its holding does not contradict the *Forklift* decision—contrary to Williams' argument. As Judge Goldberg indicated,

> I do not wish to be interpreted as holding that an employer's mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee falls within the proscription of Section 703. But by the same token I am simply not willing to hold that a discriminatory atmosphere could under no set of circumstances ever constitute an unlawful employment practice.

*Rogers,* 454 F.2d at 238. The standards for hostile environment litigation continue to be refined by the courts, as demonstrated by the *Forklift* holding. Williams' claim that the plaintiff in *Rogers* "prevailed" on the theory that the employer's discriminatory treatment of clients created a hostile working environment is erroneous. Judge Goldberg only found that the EEOC was entitled to investigate the claim of discrimination of clients, *see id.* at 240; Goldberg explicitly stated he would "leave to another day" the determination of the effect of patient segregation on the employees. *Id.* at 241.

■ In a summary judgment motion, I am required to view the facts in the light most favorable to Williams. I find that Williams has not produced sufficient evidence to demonstrate that the following conduct was based on a racially discriminatory animus:

(1) *Pressure to write tickets.* Williams offers no evidence indicating that he was

---

4. As the court in *Ward v. Johns Hopkins University,* 861 F.Supp. 367 (D.Md.1994), noted, the Fourth Circuit has applied the *Forklift* standard to a case in which a plaintiff alleges discrimination based on a hostile work environment under Section 1983. *See id.* at 376 n. 8.

pressured to write tickets because of his race.

(2) *Harassment of Williams.* Williams offers no evidence that he was harassed because he was black. To the contrary, Williams states that the harassment was done to make an example to other officers who might disclose police irregularities.

(3) *Pressure to keep silent.* Williams offers no evidence that pressure was placed only to keep black officers silent, as opposed to any officer who would allegedly threaten to disclose information.

(4) *Promotions and firing.* Williams makes a general allegation that black officers were continuously turned down for promotion and "fired for nothing." However, Williams does not present any evidence of the qualifications of these other officers or the reasons other officers were fired. To the contrary, Williams gives a good deal of evidence indicating that much of the alleged discrimination was based on taking actions to "lie or coverup," such as the promotion of black officer Hairston.

The remaining evidence pertains to allegations of discriminatory comments and discriminatory work assignments. It is conceded by Williams that Morris and Elliott never made any untoward comments to him. Moreover, Williams never complained to anyone in authority about racial slurs being used. *See* Request for Admissions Nos. 5, 6, 9, 10, 12 and 13. Thus, we are left only with comments that were made to others, e.g., Allen (and there is no evidence in the record that these comments were communicated to Williams prior to his dismissal); actions by co-workers, e.g., dispatcher Basden who presented the confederate flag petition to Williams and wore a hat which Williams found offensive (there is no evidence that Morris and Elliott were aware of these actions); and the assignment to a more stressful beat. It is only this latter allegation that merits further discussion.

 I find that Williams' evidence in this case of an unfavorable work assignment does not rise to the level of being sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *See Forklift,* 510 U.S. at 21, 114 S.Ct. at 370. At most, Williams' beat was an unpopular and stressful assignment, but the assignment was there for someone to do. The defendants did not "create" the abusive work environment. It may even be said that the defendants discriminated against Williams in his work assignment, but this is not the same as creating a hostile work environment, and Williams has asserted no cause of action for work assignment discrimination. Moreover, the timing of Williams' assertion of a hostile work environment must also be considered. Williams made a request to his immediate superior for a transfer, *see* Williams Dep. at 195, 202, but at no time did he complain or file any type of written grievance about the manner in which he was being assigned. More importantly, when filing his complaint with the EEOC, no mention was made that his working conditions were abusive. Even if one would view the unfavorable work environment as being sufficiently severe to meet *Forklift's* objective criteria, there is still a subjective element that must be proven by Williams. As the *Forklift* court stated, "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no [Section 1983] violation." *Forklift,* 510 U.S. at 21–22, 114 S.Ct. at 370–371. Williams' timing of his complaint about his working conditions and his failure to pursue a reassignment beyond that of his immediate supervisor is strong evidence that he did not subjectively perceive the environment to be abusive.

Accordingly, the defendants' summary judgment motion as to Count II of the complaint is granted.

**B. Motion for Sanctions**

 Rule 26(a) requires each party to provide the opposing party with, among other information, "the name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings, identifying the subjects of the information[.]" Fed.R.Civ.P.

26(a)(1)(A). Under the pretrial order entered in this case, this information was due from each party within twenty days of the date the defendants filed an answer.

As noted *supra*, Williams failed to provide any information pursuant to Rule 26(a) by the required deadline, prompting the defendants to file a motion to compel disclosure. Although Williams provided a list of witnesses in mid-July, this list omitted addresses, phone numbers, and the subject of discoverable information in many instances. Pursuant to a Court order dated July 25, 1996, Williams was required to supplement his disclosures by August 14, 1996. Williams failed to do so. Only after the defendants again sought a hearing from the Court did Williams provide supplemental information.

Pursuant to Fed.R.Civ.P. 37, the defendants seek the following sanctions against Williams: (a) the payment of $847 in attorneys' fees incurred by the defendants as the result of Williams' failure to make initial discovery disclosures and to comply with the Court's July 25, 1996, order; and (b) a prohibition against Williams' use as evidence any witness not disclosed in accordance with Fed.R.Civ.P. 26(a) within the time period specified in the Court's July 25, 1996, order. In view of the Court's ruling on the motion for summary judgment, the issue of evidentiary sanctions is moot.

The defendants argue that, as Williams has flagrantly violated the pretrial order and the July 25 order, sanctions under Rule 37 are appropriate. Thus, the defendants assert, this Court should order Williams to pay the $847 in fees for the 7.7 hours of attorney time spent in obtaining this information.

In rebuttal, Williams contends that the decision of the Western District of Virginia in June, 1996, to opt out of the initial disclosures required under Rule 26(a)(1) should apply retroactively in this case. In addition, the defendants served interrogatories on Williams on August 9, 1996, which also require disclosure of the Rule 26(a) information. Williams contends that he has, on two occasions, completely disclosed the information known to him. Williams points out that Rule 26(a) only requires witness addresses and phone numbers "if known." Williams states he has had difficulty in identifying the addresses and phone numbers of all his fact witnesses. In contrast, the defense provided information on no witnesses other than the named defendants. Additionally, the defendants failed to comply with Rule 26(a)'s requirement to disclose insurance coverage. Williams argues that, for sanctions to be imposed, there must be actual prejudice to the moving party. It is difficult to see how the defense has been prejudiced in pursuing a process that has been abolished. The defendants are claiming attorneys' fees for the time spent in pursuing attorneys' fees.

At oral argument, the defendants pointed out that Williams had yet to respond to the interrogatories served on August 9. Williams noted that about half of his witnesses are employees of the police department or the City of Danville; these witnesses are easily accessible to the defendants.

At the outset, I point out that the Western District's opt out decision was not made retroactive. Williams is bound by the deadlines set forth in the pretrial order.

I find that the payment of attorneys' fees is clearly warranted by the facts of this situation. The plaintiff's belated production of information in July and then hours prior to the second hearing coupled with the plaintiff's failure to communicate with opposing counsel as to his alleged delay in obtaining the needed information demonstrate a flagrant disobedience of the discovery rules.

The defendants seek $847 in attorneys' fees for 7.7 hours of time spent as the result of Williams' failure to make initial discovery disclosures and to comply with the Court's July 25, 1996, order. The defendants offer no evidence or affidavits supporting their expenses. The evidence that is in the record follows: On July 5, 1996, the defendants filed a motion compelling disclosure; the motion sought "appropriate sanctions" but did not indicate any specific monetary amount sought. On July 25, 1996, Magistrate Judge Conrad entered an order granting the defendants' motion to compel and denying the motion for sanctions. On September 16, 1996, the defendants filed a letter with the Court requesting $693.00, which the defendants allege "represents the attorneys' fees incurred by the defendants with respect to obtaining the initial disclosures from the

plaintiff." On September 19, 1996, Magistrate Judge Conrad entered an order allowing the defendants leave to file a motion for sanctions, "and supporting affidavits, as they may be advised." The present motion, filed on September 23, 1996, seeks $847.00 in fees; the motion is accompanied by a three-page memorandum that recites the chronology of events.

I will not overturn Judge Conrad's July 25 decision to deny the defendants' initial motion for sanctions. It is appropriate, however, to compensate the defendants for their efforts spent subsequent to that time. From the evidence, it appears that the defendants incurred $154 between September 16 and 23 in preparing the motion for sanctions and memorandum in support. I will also award the defendants $110 to compensate them for approximately one hour of attorney time spent in preparing the September 16 letter and arranging the telephonic hearing. This makes a total award of $264. Sanctions are imposed against Williams and his attorney jointly and severally.

### III. CONCLUSION

For the foregoing reasons, the defendants' joint motion for summary judgment is GRANTED. The defendants' motion for sanctions is GRANTED as to the payment of $264.